**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 98-4133

AKIN AKINKOYE, a/k/a A. Sam
Akins,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 98-4169

NOUYIBATOU AFOLABI,
Defendant-Appellant.

Appeals from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CR-97-151-PJM)

Argued: January 29, 1999

Decided: July 19, 1999

Before WIDENER, MURNAGHAN, and HAMILTON,
Circuit Judges.

_____

Affirmed by published opinion. Judge Murnaghan wrote the opinion,
in which Judge Widener and Judge Hamilton joined.

_____

**COUNSEL**

**ARGUED:** Margaret Nottingham Nemetz, Bowie, Maryland, for Appellant Afolabi; Michael Daniel Montemarano, MICHAEL D. MONTEMARANO, P.A., Baltimore, Maryland, for Appellant Akinkoye. Steven Michael Dettelbach, Assistant United States Attorney, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Lynne A. Battaglia, United States Attorney, Greenbelt, Maryland, for Appellee.

_____

**OPINION**

MURNAGHAN, Circuit Judge:

Before us is a criminal appeal from two defendants, Akin Akinkoye and Nouyibatou Afolabi, who were convicted of credit card fraud. They raise a number of challenges to the conviction, including claims that the district court erred in denying their motion to sever, failing to hold a Franks hearing to determine whether probable cause existed, failing to grant their motions for a judgment of acquittal, and in enhancing their sentences under the sentencing guidelines. Individually, defendant Afolabi also alleges that she did not meet the $1,000 threshold for one of the crimes charged, the district judge should have decreased her sentence because she only played a minimal role in the criminal endeavor and the entire loss was not reasonably foreseeable to her. Defendant Akinkoye claims that the enhancement for abuse of trust was not warranted because he was not in a position of trust, and that a two level increase for obstruction of justice was not warranted because the statements he made had no effect on the prosecution of his case. All in all, the district court's decisions are in order and we therefore affirm.

I.

Akinkoye was a real estate agent employed by Re/Max real estate agency and worked in its Burtonsville, Maryland office. Having determined that he needed money to invest in certain legitimate business opportunities, he planned an elaborate scheme to defraud clients of Re/Max and various financial institutions by using the clients'

2

financial and credit information to obtain credit cards from the financial institutions ("credit card companies").

On or about May 12, 1995, Akinkoye put his plan into effect. He effected the scheme by reviewing the files of clients of Re/Max, submitting credit card applications to the credit card companies and obtaining from them genuine credit cards issued in the names of the clients. He used the addresses of the properties owned by the clients to receive the credit cards. To the extent that the clients' mail was delivered into secured places -- such as inside the home or in a locked mailbox -- Akinkoye would access the mail by using the keys to the home provided by the clients. Through that process, Akinkoye managed to obtain numerous credit cards over a nineteen-month span and incurred losses of more than $200,000.[1] None of the clients was aware that their names, information and property were being used fraudulently.

Akinkoye did not work alone. Because some of the clients were women, he enlisted Afolabi's assistance in carrying out the scheme. She admitted that she gave Akinkoye pictures of herself that were ultimately used to provide photo identification for the cards. In addition, she signed the back of some of the cards that were used to obtain goods and services. She also personally used at least one of the cards in Nordstrom's.

Postal Inspectors became suspicious in December 1996 when they were contacted by credit card companies whose investigators believed that fraud was afoot. Conversations with the companies led Postal Inspector Patrick Bernardo to contact victims of the scheme. After compiling handwriting samples and descriptions resembling Akinkoye, inspectors obtained a warrant and searched Akinkoye's home. Inspectors found numerous credit cards, credit card applications, pictures of Afolabi, and other inculpating evidence. The government charged Akinkoye and Afolabi with conspiracy to violate and violations of 18 U.S.C. § 1029(a)(2), which criminalizes the unauthorized use of access devices. Afolabi was also charged with aiding and abetting violations of that statute. Both defendants made statements to police regarding their respective roles in the offenses.

_____

[1] The district court found that the total actual loss was $214,245.28.

The two defendants were tried by jury, convicted and sentenced. The instant appeal ensued.

II.

The defendants first argue that the district court erred in denying their motion for severance. They argue that because each defendant's confession implicated the other, their trials should have been held separately. The failure to do so, they argue, was highly prejudicial. We review decisions to deny motions to sever for abuse of discretion. See United States v. Brooks, 957 F.2d 1138, 1145 (4th Cir.), cert. denied, 505 U.S. 1228 (1992).

Generally, we adhere to the rule that defendants charged with participation in the same conspiracy are to be tried jointly. See United States v. Roberts, 881 F.2d 95, 102 (4th Cir. 1989). A defendant is not entitled to severance merely because separate trials would more likely result in acquittal, see Brooks, 957 F.2d at 1145, or because the evidence against one defendant is not as strong as that against the other. See id. Rather, the defendant must show prejudice . See FED. R. CRIM.

P. 14.

In the instant case, the defendants base their assignment of error on the admission of their respective redacted confessions, which they argue implicate the other party. Where the unredacted out-of-court confession of a non-testifying codefendant clearly implicates a defendant, severance is required to preserve that defendant's Sixth Amendment right to confront his accusers. See Bruton v. United States, 391 U.S. 123, 135-36 (1968). Moreover, if a redacted confession of a non-testifying codefendant given to the jury (by testimony or in writing) shows signs of alteration such that it is clear that a particular defendant is implicated, the Sixth Amendment has been violated. See Gray v. Maryland, 118 S. Ct. 1151, 1157 (1998).

In Gray, the non-testifying codefendant's statement was redacted by the government and read into evidence. See id. at 1153. The statement was redacted by simply replacing the defendant's name with blank spaces or the word "deleted." Id. The officer who read the statement into evidence indicated where the blanks and deletions were in the statement. For example, one exchange proceeded as follows:

4

> Q: Who was in the group that beat [the victim]?
>
> A: Me, [an empty space was left here],[another empty space] and a few other guys.

Id. at 1158.

When that passage was read to the jury, the officer reading it said "deleted" where the blank spaces appeared. See id. at 1153. The Supreme Court concluded that the statements obviously referred to the existence of the defendant and implicated him, in light of the follow-up questions asked by the prosecutor. Id. at 1157.

By contrast, statements that, when redacted, do not even refer to the existence of the defendant are admissible and do not require severance. See Richardson v. Marsh, 481 U.S. 200, 211 (1987). But, Richardson expressly left open the question before us here -- namely, whether redacted statements that refer to the existence of another party who may be the defendant through symbols or neutral pronouns are admissible. See id. at n.5.

The Supreme Court has strongly implied that such statements do not offend the Sixth Amendment. In Gray, the court used as an example the exchange quoted above and expressly wondered"[w]hy could the witness not, instead, have said: `Question: Who was in the group that beat [the victim]? Answer: Me and a few other guys.'" Id. at 1157.

It is that type of neutral phrase that the prosecutor used in the instant case. The prosecutor had the confessions retyped, and replaced the defendants' respective names with the phrase"another person" or "another individual." Because the retyped versions of the confessions were read to the jury, the jury neither saw nor heard anything in the confessions that directly pointed to the other defendant.

Given the neutral phrases used in the statements the defendants were not prejudiced in any way. For example, Akinkoye's statement at one point refers to "a guy in New York." Since that reference could not possibly refer to Afolabi (who is a woman) the one gender neutral

5

reference to "another person" appearing in Akinkoye's confession does not facially implicate her. Likewise, in an argument below, Akinkoye himself argued that Afolabi's confession did not implicate him because she lived with a number of males and she could have been referring to one of them. Using his own logic then, a reference to "another person" in Afolabi's confession does not facially implicate him.

Furthermore, as discussed below, there was sufficient evidence to convict both defendants without the confessions, particularly Akinkoye. Therefore, the motion to sever was properly denied.

III.

Akinkoye next argues that the district court erred in failing to hold a Franks hearing to determine whether errors in the warrant were made intentionally to mislead the magistrate into concluding that probable cause existed to search Akinkoye's home. Under the rule the Supreme Court enunciated in Franks v. Delaware , 438 U.S. 154, 155-56 (1978), where a defendant can show that the officers made misstatements of fact upon which the magistrate relied in issuing a warrant, the court will hold a hearing to determine whether the misstatements were intentional. See id.

A court will hold a Franks hearing after the defendant makes a "substantial preliminary showing" that the police misstated the facts upon which the warrant was based. See Franks, 438 U.S. at 155. Mere conclusory statements are insufficient, as is a request for a hearing simply to have more cross-examination. See id. at 171.

The district court correctly determined that a hearing was unnecessary. The warrant was issued based on facts provided by Inspector Bernardo. The inspector's affidavit averred several things, including that: credit card companies had complained of fraudulent activity, handwriting samples showed that Akinkoye's handwriting was very similar to the perpetrator's, there were photo identifications of Akinkoye as the perpetrator, and Thomas Kulina, a victim, stated that he had been defrauded.

6

Akinkoye argues that there were two major misstatements in the affidavit submitted in support of the warrant application. First, he points out that the name on the credit card used at a gas station (whose attendant identified Akinkoye) was not Thomas Kulina, but was LeeAnn Kulina, his wife. Second, he asserts that the employees of an auto dealership who made photographic identifications of him only told Bernardo that Akinkoye was in their store and that they did not see him actually using the credit card. He states that Bernardo's assertion that the employees identified Akinkoye as the person who used the Kulina card is therefore false.

However, neither of the inconsistencies warrants a Franks hearing. The purpose of Franks hearings is to determine whether the probable cause determination was based on intentionally incorrect information. Here, the record indicates that no intentionally incorrect information was given.

The gas station attendant specifically identified Akinkoye as the person who used a Kulina card and identified himself as Thomas Kulina. Akinkoye does not challenge the attendant's account, only that the card used was issued to LeeAnn Kulina. Therefore, even if Bernardo used the husband's name where he should have used the wife's, the attendant's identification of Akinkoye still links Akinkoye to criminal activity prohibited by 18 U.S.C. § 1029. Moreover, Bernardo relied on the attendant's statements. Thus, even if the attendant lied to Bernardo, Bernardo's statements would not be intentionally or recklessly misleading unless he had strong reason to believe that the attendant was lying. Akinkoye has not shown that.

The inconsistencies with respect to the employees of the automobile dealer do not create a need for a Franks hearing, either. The two employees identified Akinkoye through a photo spread as the person who used Kulina's credit card when paying for automobile parts. Akinkoye points out that the two employees never actually saw him sign the receipt or tender the card to the cashier for payment. However, the employees did state that they saw him with a credit card in his hand, and the record shows that the credit card used at the gas station was used at the automobile dealership on the same day. Moreover, we must again bear in mind that Bernardo relied on their

statements to him. Those facts were sufficient to give Bernardo probable cause to conduct his search.

In any event, probable cause existed even without those identifications. Bernardo averred that he was contacted by a bank and a victim and was told that fraud was afoot. A comparison of the fraudulent receipts he received from the bank with samples of Akinkoye's handwriting he obtained pursuant to another tip he received revealed striking similarities. Based on the handwriting analysis, Bernardo would have had probable cause to conduct a search even without the other evidence. Therefore, the district court's determination that a Franks hearing was unnecessary will not be disturbed.

IV.

The defendants next claim that their convictions under 18 U.S.C. § 1029(a)(3) should be reversed because that statute did not contemplate the use of legitimate credit cards fraudulently obtained from the credit card company itself -- i.e., cards for which the person named never actually applied. The defendants were convicted of conspiracy to violate, and violating 18 U.S.C. § 1029(a)(2), which proscribes an individual from "knowingly and with intent to defraud traffic[king] in or us[ing] one or more unauthorized access devices during any one-year period, and by such conduct obtain[ing] anything of value aggregating $1,000 or more during that period." Id. The statute defines "unauthorized access devices" as "any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud." 18 U.S.C.A. § 1029(e)(3) (West Supp. 1998).

The defendants contend that the legislative history of the statute suggests that Congress intended the statute to apply only to credit cards that are "genuine, but being misused." See H.R. REP. NO. 98-894, 98TH CONG., 2D SESS. 14 (1984). They argue that the credit cards were not "genuine" because they were never legitimately obtained by the victims, but were obtained by Akinkoye "by false applications." See Appellants' Br. at 19.

We disagree. First, Appellants ignore a well-established canon of statutory construction: if the statute is unambiguous on its face, the court will not look to the legislative history. See Ex Parte Collett, 337

8

U.S. 55, 61 (1949); First United Methodist Church v. United States Gypsum Co., 882 F.2d 862, 865 (4th Cir. 1989), cert. denied, 493 U.S. 1270 (1990). The statute unambiguously criminalizes the obtaining of an access device with the intent to defraud, since that conduct is specifically included in the definition of "unauthorized use." See 18 U.S.C.A. § 1029(e)(3). None of the statutory language suggests that the cards must have been originally obtained by the rightful cardholder. In fact, the phrase "obtain with intent to defraud" is not modified in any way at all. Id.

The Appellants concede that Akinkoye "obtained[the credit cards] by false applications," and that he and Afolabi signed and used some of them. There is no dispute that credit cards are"access devices" within the meaning of 18 U.S.C. § 1029 (e)(1), or that Akinkoye acted intentionally or knowingly in originally obtaining them or that Afolabi acted intentionally or knowingly in obtaining the cards from Akinkoye and using them. Since they intended to defraud the person whose credit was relied upon and the companies issuing the cards, there is no doubt that the defendants' conduct fits squarely within the language of the statute. There is no need to look any further than the statute's plain wording.

Even if we were required to review the language the Appellants quoted, their convictions would stand. Akinkoye did not create or manufacture the cards. Rather, the credit card companies issued actual credit cards to him. As Akinkoye proved, the cards could be -- and were -- used in commerce just like all of the other credit cards the companies regularly issue. Therefore, they are "genuine" cards.

Moreover, the cards certainly were "misused." Akinkoye and Afolabi confessed to using the cards to obtain goods and services. They had no permission to avail themselves of the lines of credit the credit card companies intended to extend to the victims. In fact, the victims did not know that the lines of credit had been extended to them. Therefore, the cards were "misused." In short, the Appellants' convictions should stand.

V.

Afolabi claims that there was insufficient evidence to convict her of violating § 1029(a)(2) because she only defrauded one person, one

9

time, for an aggregate cost of $647. The statute requires the defendant to "traffic[ ] in or use[ ] one or more unauthorized access devices during any one-year period, and by such conduct obtain[ ] anything of value aggregating $1,000 or more during that period." Id. Challenges to the sufficiency of the evidence require that the reviewing court view the evidence in the light most favorable to the government to determine whether a reasonable fact finder could rationally find the defendant guilty beyond a reasonable doubt. See United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982).

Viewed in the light most favorable to the government, there is sufficient evidence to convict Afolabi. Under § 1029(a)(2), the use of the unauthorized access device is made criminal. As stated above, the phrase "obtain with intent to defraud" is not modified. Nowhere in its plain language or its legislative history does that section require that the unauthorized user obtain the credit card directly from the victim. Nor does the definition of "unauthorized access device," from which the "obtain with the intent to defraud" language is taken, require that the defendant acquire the card directly from the victim. All the statute requires is that the defendant obtain the credit card with the intent to defraud. Since Afolabi obtained the cards with the intent to defraud the persons whose names appear on the cards and the issuers of the cards, she is an "unauthorized" user of the cards.

Afolabi also meets the threshold amount in 18 U.S.C.§ 1029(a)(2). Afolabi claims that she made only $647 worth of charges, having used a Nordstrom's card ostensibly issued to a former Re/Max client. However, Afolabi indicated to the police that she used two cards issued to that woman.[2] The evidence presented showed that only two cards were issued in that woman's name. That second card, a Bloomingdale's card, was used the same day as the Nordstrom's card and $522.89 was charged. Thus, the evidence shows that more than $1,100 was charged on that person's accounts alone on one day. Therefore, there was sufficient evidence for a reasonable jury to conclude beyond a reasonable doubt that Afolabi violated 18 U.S.C. § 1029(a)(2).

_____

[2] The record shows that Afolabi initialed the pages of police documents containing the names of the persons whose identities appeared on the cards she actually used.

10

Moreover, Afolabi was also convicted of aiding and abetting violations of that statute. Aiders and abettors are liable to the same extent as the principal. See 18 U.S.C.A. § 2(b) (West Supp. 1998). According to Afolabi's signed confession, she used five of the fraudulently obtained credit cards. She signed several others that she did not personally use. The record reveals that those cards were used to charge thousands of dollars worth of merchandise. Therefore, there is sufficient evidence to sustain her convictions.

VI.

Finally, the defendants raise several challenges to their respective sentences. Afolabi claims that she should have received a reduction for her role in the offense and that the total loss was not reasonably foreseeable to her. Akinkoye claims that he did not abuse a position of trust as that term is defined in the Guidelines and that the district court erred in enhancing his sentence for obstruction of justice. We will address the enhancements in turn, bearing in mind that the district court's factual determinations underlying the enhancements are reviewed for clear error, while the legal interpretations are reviewed de novo. See 18 U.S.C.A. § 3742(e) (West Supp. 1998); United States v. Daughtrey, 874 F.2d 213, 217-18 (4th Cir. 1989).

A. The Refusal To Reduce Afolabi's Sentence

Afolabi contends that the district court erred in refusing to adjust her sentence downward because she merely signed the back of some of the cards and occasionally accompanied Akinkoye when he used the cards. She argues that since she never applied for any of the cards and never held on to any of them, she is entitled to the downward adjustment given to those who play a minimal role in the offense. See U.S.S.G. § 3B1.2 (West Supp. 1998).

Under U.S.S.G. § 3B1.2, a district court must reduce the defendant's sentence if it finds that the defendant played a minimal or minor role in the offense. A defendant is entitled to a four-level adjustment if his or her role was minimal, see U.S.S.G. § 3B1.2(a), and a two-level adjustment if his or her role was minor, but not minimal. See U.S.S.G. § 3B1.2(b). If the defendant's role fell between those two descriptions, then a three-level adjustment is prescribed.

11

See U.S.S.G. § 3B1.2. A defendant seeking a downward adjustment for his or her minor role in the offense must prove that he or she is entitled to it by a preponderance of the evidence. See United States v. Gordon, 895 F.2d 932, 935 (4th Cir.), cert. denied, 498 U.S. 846 (1990).

The commentary to U.S.S.G. § 3B1.2 makes clear that these adjustments are targeted at defendants who are "substantially less culpable than the average participant." U.S.S.G. § 3B1.2 cmt., backg'd. In determining whether the adjustments apply, we not only look at the defendant's conduct relative to the other defendants, but also at his or her conduct relative to the elements of conviction. See Daughtrey, 874 F.2d at 216. In doing so, we ask whether "the defendant's conduct is material or essential to committing the offense." United States v. Palinkas, 938 F.2d 456, 460 (4th Cir. 1991), judgment vacated on other grounds by, Kochekian v. United States , 503 U.S. 931 (1992), op. reinstated by, United States v. Kochekian, 977 F.2d 905 (1992).

While it is true that Afolabi was less culpable than Akinkoye, she surely was "material or essential" to the offense. As recounted above, Afolabi not only signed the back of some of the credit cards, but she also accompanied Akinkoye into various retail establishments where the cards were used. Indeed, the very point of including Afolabi in the scheme was to facilitate Akinkoye's use of cards with women's names on them. The cards signed by Afolabi were used to purchase thousands of dollars worth of goods and services. **3** Therefore, Afolabi cannot establish that she played a minimal or minor role in the offense and the district court's conclusion to that effect was not clearly erroneous.

B. Reasonable Foreseeability Of Loss

Afolabi also contends that the total loss occasioned by the scheme, $214,245.28, was not reasonably foreseeable to her because she only used one card for a total loss of $647. Under U.S.S.G.

_____

**3** The record establishes that cards issued in women's names were used to obtain nearly $70,000 worth of material goods. See J.A. at 644-45. Afolabi admitted to signing cards bearing the names of many of the women.

§ 1B1.3(a)(1)(B), a conspirator may be held responsible not only for the losses his own conduct personally caused, but also for any other losses resulting from the furtherance of the conspiracy that were reasonably foreseeable to him. The commentary to § 1B1.3(a)(1)(B) makes clear, however, that only those losses resulting from conduct occurring in furtherance of the jointly undertaken criminal enterprise are relevant. See id. In the instant case, the district court concluded that the entire loss caused by the conspiracy was reasonably foreseeable to Afolabi.

Afolabi continues to maintain that the only loss reasonably foreseeable to her was the $647 charge that she detailed in her confession. However, the weight of the evidence reflects that the district court did not err in concluding that Afolabi could foresee the additional losses.

First, Afolabi's continued efforts to cling to the one $647 loss as her only participation miss the mark. The record reflects that Afolabi indicated through her initialing certain pages of police documents that she used five of the cards at issue. She later stated that she signed the backs of other cards but did not personally use all of those cards. She also accompanied Akinkoye during many of his transactions. Certainly, losses occasioned by the use of those cards were reasonably foreseeable to her.

The losses resulting from the use of the cards with men's names on them presents a much closer question. There is no direct evidence that Afolabi helped Akinkoye use the men's cards. As a result, Afolabi argues that she could not reasonably foresee any of the losses resulting from their use.

However, the record establishes that: (1) there is great overlap in the days during which men's and women's cards were used;[4] (2) Afolabi accompanied Akinkoye whenever the women's cards were used; (3) Akinkoye ultimately retained the possession of all of the cards; and (4) many of the overlapping fraudulent transactions

_____

[4] As one example, Inspector Bernardo testified that in the case of one husband and wife who were victimized, the dates of eight of the eleven transactions in which the wife's card was involved also showed use of the husband's card.

occurred within close geographic proximity of each other. In light of those facts, the district court could reasonably infer that Afolabi was with Akinkoye during the transactions and that the use of the cards was within the scope of the conspiracy. Therefore, the district court did not clearly err in its conclusion that Afolabi could reasonably foresee the entire loss.

C. The Abuse Of Trust Enhancement

Akinkoye disputes the district court's decision to increase his sentence because he abused a position of trust. Akinkoye contends that real estate agents do not occupy a position of trust, or, in the alternative, that the only victims were the banks, with whom he held no position of trust. Under U.S.S.G. § 3B1.3 (1998), a district court must increase the defendant's sentence by two levels if it determines that the defendant abused a position of trust and that abuse significantly contributed to the commission or concealment of the crime. See id. We review the district court's factual determination that Akinkoye abused a position of trust for clear error. See United States v. Mackey, 114 F.3d 470, 476 (4th Cir. 1997).

Akinkoye's first argument is unpersuasive. He cites a series of cases in other circuits where defendants of various occupations were held not to have abused trust.5 In our circuit, however, we have rejected a mechanistic approach to the abuse of trust enhancement that excludes defendants from consideration based on their job titles. See United States v. Gordon, 61 F.3d 263, 269 (4th Cir. 1995) ("The abuse of trust enhancement was not designed to turn on formalistic definitions of job type.").6 Instead, we examine several factors in

_____

5 **See, e.g.**, United States v. Ragland, 72 F.3d 500, 502-03 (6th Cir. 1995) (holding that a particular bank clerk did not abuse trust); United States v. Brown, 47 F.3d 198, 205-06 (7th Cir. 1995) (individuals selling real estate to victims had only a commercial, not a trust, relationship with them); United States v. Smaw, 22 F.3d 330, 332 (D.C. Cir. 1994) (accounting clerk with access to Social Security Numbers did not abuse trust).

6 In Gordon, for example, we permitted the enhancement for a head bank teller who gave security and other information to individuals seeking to rob the bank for which she worked. See id. at 269-70. In general, the abuse of trust enhancement does not apply to bank tellers because they generally do not have sufficient managerial discretion to create a trust relationship. See U.S.S.G. § 3B1.3, Application Note 1.

14

determining whether a particular defendant abused a position of trust. Those factors include: (1) whether the defendant had either special duties or "'special access to information not available to other employees'"; (2) the extent of discretion the defendant possesses; (3) whether the defendant's acts indicate that he is"'more culpable' than others" who are in positions similar to his and who engage in criminal acts; and (4) viewing the entire question of abuse of trust from the victim's perspective. See id. (citations omitted).

In reviewing the factors mentioned above, we cannot conclude that the district court clearly erred in determining that Akinkoye held a position of trust and abused it. First, Akinkoye had special access to information as a real estate agent. Re/Max's clients not only gave Re/Max confidential information (such as Social Security Numbers), but also the keys to their respective homes. These items were given to Re/Max to facilitate Re/Max's representation of them in the sale of their homes.

Although the confidential information and the keys were located where any Re/Max employee theoretically could have accessed them, a real estate agent's use of them is far less likely to arouse suspicion than another staffer's. Akinkoye entered clients' homes and took files home with him without much concern on Re/Max's part because such activities are consistent with his duties as an agent. By contrast, a Re/Max secretary undoubtedly would have aroused suspicion much more quickly by engaging in those activities. Akinkoye's ability to set his own schedule and work odd hours with little supervision and little concern from Re/Max also facilitated the crimes. Those facts show that Akinkoye's position made his criminal activity difficult to detect, which is a basis for the enhancement. See U.S.S.G. § 3B1.3, n.1.

The second and third factors also are met. Akinkoye had great discretion. The manager of the Re/Max office in which Akinkoye worked testified that the agents enjoy broad discretion in the hours they work, freedom of access to information and other matters. She also stated that the agents are subject to little supervision. Based on her uncontroverted testimony, the second factor is met.

In addition, the third factor is met because of the nature and extent of Akinkoye's crime. Over a nineteen-month span, Akinkoye

15

acquired dozens of credit cards through his scheme and caused an actual loss of $214,245.28. He wrote more than $30,000 worth of fraudulent checks to the credit card companies in an effort to increase the limits of the cards. He also enlisted the help of a woman, Afolabi, to facilitate the use of the cards with women's names on them. In all, Akinkoye is more culpable than other real estate agents who may commit crimes.

Finally, we must view Akinkoye's position from the perspective of the victim. Akinkoye first asserts that the banks were the real victims and from their perspective, he had an ordinary commercial relationship (credit card applicant to credit card company relationship). See United States v. Moore, 29 F.3d 175, 178 (4th Cir. 1994) (holding that an ordinary commercial relationship between the perpetrator and victim is insufficient to support the abuse of trust enhancement). However, it seems to us that although the banks ultimately have borne the financial burden, the Re/Max clients have been victimized as well. Their identities and credit histories were used to facilitate the crime, and several of the clients testified to the difficulties they experienced in clearing up matters with the various credit agencies. One client received constant harassment at home and work from creditors. Another victim's search for a new home was impeded because of the credit problems caused by Akinkoye's activity. Thus, Akinkoye's focus on the ultimate financial burden ignores the emotional, financial and other burdens borne by the clients until the extent of the fraud scheme was exposed and corrected.

Moreover, Akinkoye need not have personally known the Re/Max clients he defrauded to be subject to the enhancement. The clients trusted Re/Max to represent them. Their personal information was made available to all of Re/Max's agents in order to facilitate effective representation. Akinkoye would not have had access to the homes and information if not for his status as an agent.

Furthermore, Akinkoye's reading of the Guidelines would lead to absurd results. If we were to adopt his interpretation of the Guidelines, then, for example, the managing partner of a law firm could not be held to have abused trust of clients of the firm whom he or she had not met. Yet, that partner is precisely the type of person to whom the enhancement was intended to apply, because the clients engaged the

16

firm to represent them. Similarly, Re/max's clients engaged Re/max to represent them, and they placed their confidence in Re/max's agents as their representatives. Akinkoye used that trust to obtain credit cards and execute a fraud scheme. Therefore, the district court's determination that Akinkoye abused a position of trust was not clearly erroneous.

D. The Obstruction Of Justice Enhancement

Finally, Akinkoye disputes the district court's enhancement for obstruction of justice. The district court enhanced Akinkoye's sentence by two levels because it found that Akinkoye committed perjury during a pretrial hearing. While testifying under oath during a hearing pursuant to his motion to suppress evidence, Akinkoye uncategorically denied ever having given any statement to the police about the credit card scheme. Several days earlier, Akinkoye confessed to his role in the scheme and gave a detailed statement.

The enhancement for obstruction of justice may properly be based on perjurious testimony. See U.S.S.G. § 3C1.1, n.3 (1998). We have held that perjurious testimony given in pretrial proceedings may be considered in determining whether to apply the enhancement. See Gordon, 61 F.3d at 270. In applying the enhancement, the district court must specifically identify the perjurious statements and make a finding either as to each element of perjury or"`that encompasses all of the factual predicates for a finding of perjury.'" Id. (quoting United States v. Dunnigan, 507 U.S. 87, 95 (1993)).

In the instant case, Akinkoye repeatedly denied that he ever told Inspector Bernardo of his involvement in the scheme. However, the Inspector recounted in detail Akinkoye's account of the events. The district judge expressly found that Akinkoye lied when he stated that he did not make any of the statements attributed to him, and that the issue of whether the statements were lawfully obtained "was the whole hearing." J.A. at 540. Based on that record, we conclude that the district court neither erred in finding perjury nor erred in applying the enhancement for obstruction of justice.

As the district court's determinations appear to be in order, the judgment is hereby

AFFIRMED.