**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 15-4195**

———————

UNITED STATES OF AMERICA,

            Plaintiff - Appellee,

      v.

LESTER L. WOODS,

            Defendant - Appellant.

———————

**No. 15-4196**

———————

UNITED STATES OF AMERICA,

            Plaintiff - Appellee,

      v.

MICHAEL L. JOHNSON,

            Defendant - Appellant.

———————

Appeals from the United States District Court for the District of South Carolina, at Columbia.  Terry L. Wooten, Chief District Judge.  (3:14-cr-00093-TLW-1; 3:14-cr-00093-TLW-2)

———————

Argued:  May 12, 2016                    Decided:  June 28, 2016

———————

Before  KEENAN  and  FLOYD,  Circuit  Judges,  and  DAVIS,  Senior Circuit Judge.

———————

Affirmed by unpublished per curiam opinion.

———————————

**ARGUED:** Beattie Balentine Ashmore, BEATTIE B. ASHMORE, PA, Greenville, South Carolina; Kimberly Harvey Albro, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbia, South Carolina, for Appellants. Winston David Holliday, Jr., OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee. **ON BRIEF:** William N. Nettles, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

A jury in the District of South Carolina convicted Appellants Lester Woods and Michael Johnson of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. On appeal, Appellants present several issues for our review, most importantly, whether the conduct for which they were indicted and convicted is prohibited by the wire fraud statute.

## I.

### A.

We begin by providing a bit of background about the participants in this case and the credit reporting and credit repair businesses involved. At the time of the events giving rise to this case, Johnson served as the sheriff of Williamsburg County, South Carolina. Woods ran a credit repair organization. A "credit repair organization" is "any person who . . . sell[s], provide[s], or perform[s] . . . any service, in return for the payment of money or other valuable consideration, for the . . . purpose of . . . improving any consumer's credit record, credit history, or credit rating." 15 U.S.C. § 1679a(3). In short, Woods's business purported to improve consumers' credit in return for the payment of fees.

Equifax is a consumer reporting agency. A "consumer reporting agency" is "any person which, for monetary fees . . .

3

regularly engages . . . in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties." 15 U.S.C. § 1681a(f).

As a consumer reporting agency, Equifax receives information from various data furnishers such as banks and others who make consumer credit loans. Equifax aggregates that data, identifies which consumer it belongs to, and packages it in a format friendly to consumers and Equifax's paying customers. This package—a credit report—is marketed to companies evaluating the credit worthiness of a given consumer. Equifax also has a quality assurance department that reviews the raw data from data furnishers and attempts to validate it. Customers of Equifax pay for the service Equifax provides in aggregating, packaging, and attempting to verify the data.

When a consumer or other entity notifies Equifax of potential identity theft, Equifax places a fraud alert on the consumer's report. The fraud alert warns any potential lender that the lender needs to verify the identity of the consumer and the legitimacy of the transaction the lender proposes to undertake with that consumer. When Equifax flags particular items on a credit report arising from identity theft, Equifax deletes those items from the consumer's report. Subsequent

4

potential lenders who order that consumer's credit report see a cleaned file without the deleted transactions.

With this background in mind, we turn to the particular scheme to defraud at issue in this appeal.

B.

A grand jury indicted Woods and Johnson on February 19, 2014 for conspiracy to commit wire fraud. In the alleged conspiracy, Woods provided Johnson the personal identification information—such as names, addresses, and social security numbers—of Woods's credit repair clients. Johnson then prepared police incident reports from the Williamsburg County Sheriff's Office that falsely listed Woods's clients as victims of identity theft. Johnson returned these false police reports to Woods, and Woods submitted them to Equifax.

Woods intended to cause Equifax to remove various items, especially non-performing loans, from the clients' credit reports, thereby improving the clients' credit scores. The indictment alleges that this scheme falsely and fraudulently improved the credit histories and scores of over 130 of Woods's clients. Woods typically charged his clients several hundred to a few thousand dollars each to have their credit improved. The false police incident reports induced Equifax to suppress information from the credit reports of Woods's clients. This

5

suppression allegedly impaired the "integrity and availability" of the data and information that Equifax provided to its own customers, generally third parties seeking to evaluate the credit risk a consumer poses. J.A. 31.

C.

A five-day jury trial was held between September 15, 2014 and September 19, 2014. At trial, witnesses from Equifax testified about the impact of placing an incorrect fraud alert on a consumer's file, as Equifax did in response to the police incident reports Woods received from Johnson. When an incorrect fraud alert is placed on a consumer's report, or when items are incorrectly deleted from a report, the information Equifax presents to its customers is less accurate. Equifax considers such information "to be corrupted because it [is] no longer an accurate credit file." J.A. 323. Inaccuracies in a credit report "raise concerns for people that are buying information from [Equifax]," J.A. 188, and may, by extension, reduce the value of the credit reporting services Equifax provides. In this case, Equifax suppressed information about loans totaling $11.8 million from the credit reports of Woods's clients because of the identity theft incident reports generated by Johnson at the Williamsburg County Sheriff's Office.

6

The government elicited testimony from thirteen people who paid Woods a total of $31,750 to have their credit "improved." This improvement was due, unbeknownst to the clients, to the production of false identity theft incident reports at the Williamsburg County Sheriff's Office. The improvement was only temporary; Equifax intends to restore the wrongfully deleted items to the credit reports. Thus, Woods's clients paid for temporary, illusory improvements in their credit scores, which Woods achieved by submitting false police reports to Equifax. Most of the witnesses testified that they never filed an identity theft incident report with the Williamsburg County Sheriff's Office and never authorized anyone to file such a report on their behalf.

The FBI case agent also testified at trial. During his investigation, the agent interviewed Johnson on multiple occasions. On one occasion, Johnson indicated that he had received the information that he included in the incident reports from Woods. Before the beginning of trial, Woods sought to exclude this testimony as violative of the Confrontation Clause because Johnson would not be subject to cross-examination about the statement if he elected not to testify. After briefing and a lengthy hearing, the district court permitted testimony about Johnson's statement but ordered that any mention of "Woods" be replaced with the words "someone else." In

7

keeping with this ruling, the agent testified during trial on direct examination that Johnson told him "the information [in the incident reports] was actually provided to [Johnson] by someone else." J.A. 1001. The agent testified that Johnson originally stated that the supposed victims of identity theft had called, faxed, and visited Johnson to make their complaints; however, "in a later interview [Johnson] retracted that and said that he had been provided that information by someone else." J.A. 1045.

Evidence showed that Johnson and Woods met when Johnson sought to repair his own credit. After this introduction, the two exchanged a number of faxes and hundreds of calls and text messages between March 2012 and February 2013. An investigation of IP addresses linked computers at the Williamsburg County Sheriff's Office, including Johnson's, to Woods's computer and to the submission of the false reports to Equifax. Johnson authored 276 false identity theft incident reports, 104 of which were linked to him through his computer and the other 172 of which were linked to him through his departmental username.

During the presentation of the defense's case, Woods testified on his own behalf and denied the allegations against him. Woods testified that he never paid Johnson anything to prepare police reports. Johnson did not testify, but presented

8

two witnesses who testified to his character for honesty, hard work, and trustworthiness.

The jury returned a verdict of guilty as to both Appellants on September 19, 2014.

## D.

The district court held a sentencing hearing on March 25, 2015. At sentencing, the court characterized those who paid Woods for credit repair services as victims of the fraud. The court found that at least 245 consumers were victims of the conspiracy and that they suffered pecuniary losses of at least $31,750. The court sentenced Woods to thirty-three months' imprisonment and ordered payment of a $100 special assessment and $15,875 in restitution. The court sentenced Johnson to thirty months' imprisonment and ordered payment of a $100 special assessment and $15,875 in restitution. The restitution payments were to be made to Woods's clients, not to Equifax. Woods and Johnson appealed their convictions.

## II.

On appeal, Woods and Johnson raise four issues: (1) whether Equifax was deprived of property as required by the wire fraud statute; (2) whether the district court constructively amended the indictment at sentencing by naming the credit repair

clients, instead of Equifax, as the fraud's victims; (3) whether the motions for acquittal should have been granted on the grounds that the government failed to show that Equifax was deprived of property; and (4) whether the evidence was sufficient to support the convictions for conspiracy. Woods also contends that his Confrontation Clause rights were violated when the investigating FBI agent testified about Johnson's out-of-court statement implicating Woods.

A.

Woods and Johnson assert that Equifax has no property interest cognizable under the federal wire fraud statute in the accuracy and integrity of its information. The parties dedicate significant portions of their briefs to this question. We, however, see no need to reach that issue. The evidence introduced at trial makes clear that Woods and Johnson were properly convicted of conspiracy to commit wire fraud because they defrauded Woods's clients of the money the clients paid Woods to secure a legitimate improvement in their credit scores.

The federal wire fraud statute criminalizes the use of the wires to execute "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343; see also id. § 1349 (criminalizing conspiracy to attempt § 1343 wire

10

fraud). "[T]o convict a person of mail fraud or wire fraud, the government must show that the defendant (1) devised or intended to devise a scheme to defraud and (2) used the mail or wire communications in furtherance of the scheme." United States v. Wynn, 684 F.3d 473, 477 (4th Cir. 2012). "[T]he mail fraud and wire fraud statutes have as an element the specific intent to deprive one of something of value through a misrepresentation or other similar dishonest method, which indeed would cause him harm." Id. at 478.

As noted above, the evidence showed that Woods and Johnson devised a scheme in which they (1) obtained money from clients seeking to improve their credit scores;[1] (2) created fraudulent police incident reports listing the clients as victims of identity theft; (3) used the wires, including fax and the internet, to submit the false police reports to Equifax; and (4) thereby temporarily and without justification improved the clients' credit scores, even though such improvements were ultimately of no value to the clients. The clients paid for legitimate, lasting improvements to their credit, but received only illegitimate, temporary improvements. The government's

_____

[1] Although the evidence reflects that Johnson, unlike Woods, did not obtain or intend to obtain any money or property as a result of his participation in the fraudulent scheme, see J.A. 1147–48, 1180–81, 1190, Johnson was nonetheless subject to co-conspirator liability for his role in the scheme.

11

focus on Equifax as "the primary victim of [the] fraud" at trial notwithstanding, see J.A. 152, the evidence showed that Woods and Johnson conspired to deprive Woods's clients of money through misrepresentations and used the wires to communicate with Equifax in furtherance of the scheme.[2]  This conduct violates the wire fraud statute.

Because it does, and because the evidence demonstrates that property—the money paid to Woods—was obtained from victims of the fraud, we need not decide whether Equifax had a property

_____

[2] "Primary," of course, is not synonymous with "only."  In its opening statement, the government also identified Woods's clients as victims of the scheme to defraud:

> [W]hen [the clients] went to him, this is costing anywhere from 800 to $1500 for him to do that.  So if you think about it, when these people hired Lester Woods in a legitimate way to clean up their credit, he's doing this in an illegitimate way, taking their money, hundreds if not over a thousand dollars per person, and really causing them more headaches.
>
>  . . . .
>
> [I]t matters to the people that are actually trying to do something about their credit because they are paying good money to try to get themselves back on their feet thinking that Lester Woods is doing them some good when actually he's compounded their problems.

J.A. 157-58.  From the very start of trial, then, the government indicated that it believed the consumers to be victims of the scheme.

12

interest cognizable under the wire fraud statute in the accuracy and integrity of its information.

B.

At sentencing, the district court took the same view of the evidence as we do today and identified Woods's clients as the victims of the scheme to defraud. The district court ordered Woods and Johnson to pay restitution to the credit repair clients, not to Equifax. Woods and Johnson complain that the statements by the district court at sentencing wrought a constructive amendment of the indictment because, they argue, the indictment discussed only Equifax as a victim and the jury heard evidence pertaining only to Equifax.[3] We disagree.

We review de novo the question of whether the indictment was constructively amended. United States v. Whitfield, 695 F.3d 288, 306 (4th Cir. 2012). "A constructive amendment to an indictment occurs when either the government (usually during its presentation of evidence and/or its argument), the court (usually through its instructions to the jury), or both,

---

[3] Appellants concede that we have never before recognized a constructive amendment challenge based on sentencing proceedings. We assume without deciding that such a challenge is cognizable.

13

broadens the possible bases for conviction beyond those presented by the grand jury." United States v. Floresca, 38 F.3d 706, 710 (4th Cir. 1994) (en banc). "[A] constructive amendment of the indictment constitutes error per se." Id. at 711. A constructive amendment "destroy[s] the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury." Stirone v. United States, 361 U.S. 212, 217 (1960). A constructive amendment occurs most often when the court instructs the jury about an offense not indicted.[4]

To be sure, Equifax plays a prominent part in the indictment; however, mention of Woods's clients is pervasive. The following excerpts from the indictment illustrate the point:

- Paragraph 10 of the indictment charges as follows: "Lester L. Woods and Michael L. Johnson engaged in a scheme to falsely and fraudulently improve the credit histories and credit scores of over 130 consumers. The consumers were typically charged several hundred to a few thousand dollars to have their credit improved." J.A. 30.

- Paragraph 11 elaborates on the scheme: "In furtherance of the scheme to defraud, . . . [Woods and Johnson] . . . furnished to Equifax information falsely and fraudulently indicating that the consumers had been victims of Identity Fraud or Identity Theft. [Woods and Johnson] conveyed this [information] knowing that the consumers had not been victims of Identity Fraud or Identity Theft. . . . These false

[4] We note that the jury instructions did not require the jury to find that Equifax was the victim of the fraud.

14

and fraudulent Incident Reports and documents provided Equifax with consumer personal identity information . . . ." J.A. 30.

- Paragraph 12 alleges that the furnishing of the false police incident reports "falsely and fraudulent improved [over 130 consumers'] credit histories and scores." J.A. 31

- The indictment further provides the dates and various incident report numbers of false identity theft police reports and provides the initials of the consumer victim associated with each false report. See J.A. 32-36.

Whatever else the indictment may allege about Equifax, at a minimum the indictment alleges that Woods and Johnson conspired to obtain money from consumer victims who paid the conspirators money to improve their credit histories and scores but who, instead, received only false and fraudulent improvements. We conclude that there was no constructive amendment of the indictment in this case.

Even if the indictment did not fully cover the context and particulars of the crime, what occurred here would at most constitute a variance rather than a constructive amendment. We have explained:

> A variance occurs when the facts proven at trial support a finding that the defendant committed the indicted crime, but the circumstances alleged in the indictment to have formed the context of the defendant's actions differ in some way nonessential to the conclusion that the crime must have been committed. Once a reviewing court determines that the facts incorrectly noted in the indictment do not concern an issue

15

> that is essential or material to a finding of guilt, the focus is properly upon whether the indictment provided the defendant with adequate notice to defend the charges against him.

Floresca, 38 F.3d at 709-10 (footnotes omitted). "Any variance between indictment and proof which does not modify the elements of the crime charged will not invalidate a conviction unless it prejudices the defendant." United States v. Odom, 736 F.2d 104, 118 (4th Cir. 1984) (citation omitted).

Although "the victim is important in a case of wire fraud," the specific identity of the victim is not an element of the offense. United States v. Strothman, 892 F.2d 1042, 1989 WL 156906, at *5 (4th Cir. 1989) (unpublished) (per curiam). This is because "the emphasis of the statute is that a property or monetary loss was incurred by the victim . . . . Thus, the victim is incorporated into the 'scheme to defraud' element of the statute." Id. (citing United States v. Mandel, 862 F.2d 1067 (4th Cir. 1988); McNally v. United States, 483 U.S. 350 (1987)).

Given the numerous allegations in the indictment concerning Woods's clients, there can be no doubt that Woods and Johnson were on notice of the proof the government intended to offer about how their scheme operated and who it affected. Further, given the detail of the indictment, Appellants could not be subject to a later prosecution for the violations of the wire

16

fraud statute that were the subject of this conviction. Thus, we find that there was no prejudice to Appellants to the extent there was a variance between the indictment and the government's arguments raised at sentencing

In light of the detailed contents of the indictment and the structure of the wire fraud statute, we conclude that Appellants' constructive amendment argument is without merit.

C.

Appellants argue that the district court erred when it denied their motions for acquittal. "We review de novo the district court's denial of a motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure." United States v. Green, 599 F.3d 360, 367 (4th Cir. 2010). "[W]e view the evidence in the light most favorable to the prosecution, and inquire whether a rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt." United States v. Singh, 518 F.3d 236, 246 (4th Cir. 2008).

Woods and Johnson argue that their motions for acquittal should have been granted because, in their view, the government presented no evidence at trial that Equifax was harmed by the fraudulent reports. This argument is a natural corollary of Appellants' contention that Equifax was not deprived of

17

property. However, as noted above, the evidence, taken in the light most favorable to the government, is clear that Woods and Johnson obtained money from the credit repair clients, and the clients were harmed by the scheme because they paid money to have their credit improved when, in fact, it was not improved. We conclude that the district court properly denied the motions for acquittal.

D.

Woods and Johnson also contend that there was insufficient evidence to support their convictions because the record lacks evidence of: (1) an agreement for an unlawful purpose, (2) intent to knowingly do something unlawful, and (3) specific intent to deprive Equifax of something of value. "We must sustain a guilty verdict that, viewing the evidence in the light most favorable to the prosecution, is supported by substantial evidence." United States v. Brooks, 524 F.3d 549, 563 (4th Cir. 2008) (internal quotations and citation omitted). "Substantial evidence" is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." Id. (citation omitted). "[A] reviewing court is not entitled to assess the credibility of witnesses, but rather must assume that the jury resolved all contradictions . . . in favor of the Government."

18

Id. (second alteration in original) (internal quotations and citation omitted).

In this case, substantial evidence supports the conspiracy convictions. The evidence showed the links between Woods and Johnson whereby Woods used Johnson to make out false identity theft incident reports to submit to Equifax. Various clients of Woods who were the subjects of the incident reports testified that they were not in fact victims of identity theft. Evidence showed that Woods and Johnson exchanged a large number of faxes and hundreds of calls and text messages between March 2012 and February 2013. An investigation of IP addresses linked computers at the Williamsburg County Sheriff's Office, including Johnson's, to Woods's computer and the submission to Equifax of the false reports. Johnson authored 276 false incident reports, 104 of which were linked to him through his computer while the other 172 were linked to him through his departmental username. Together, these communications provide sufficient circumstantial evidence of an agreement between Johnson and Woods.

The evidence, again taken in the light most favorable to the government, shows a sophisticated scheme involving the exchange of client information, the drafting of false incident reports by Johnson, the return of those false reports to Woods, and the submission to Equifax of the reports by email or fax. Substantial evidence supports Appellants' convictions for

engaging in a conspiracy to commit wire fraud in which Appellants conspired to deprive Woods's clients of money by offering to legitimately improve their credit scores, when in fact, the two fraudulently improved the scores by submitting false identity theft police reports to Equifax over the wires.[5]

## III.

Finally, Woods argues that his Confrontation Clause rights were violated when the FBI investigating agent testified about Johnson's out-of-court statement that implicated Woods. In response to an objection, the district court ordered the agent to use the phrase "someone else" instead of "Woods" whenever he testified about Johnson's confession in a manner that implicated Woods.

A co-defendant's confession directly implicating another defendant is inadmissible when the confessing co-defendant is not available for cross-examination. See Bruton v. United States, 391 U.S. 123, 137 (1968). A prosecutor cannot circumvent this bar by simply replacing the defendant's name

---

[5] Because we consider the evidence about the consumer victims sufficient to support a wire fraud conviction, we need not address Appellants' argument regarding proof of Appellants' specific intent to deprive Equifax of something of value. The evidence shows that they intended to deprive, and succeeded in depriving, the consumer victims of something of value, namely their money.

20

with a blank, the word "deleted," or other similar words or phrases because these are too "obvious indication of alteration . . . [that] leave statements that, considered as a class, so closely resemble Bruton's unredacted statements [as to violate the Constitution]." Gray v. Maryland, 523 U.S. 185, 192 (1998). Other types of alterations, however, may avoid a Bruton defect. See Richardson v. Marsh, 481 U.S. 200, 211 (1987) (approving admission of a confession redacted to eliminate a defendant's name or any reference to her existence).

Two controlling cases approve the procedure the district court adopted in this case. First, the Supreme Court in Gray suggested that a modification of the type made in this case would raise no constitutional concerns. The Gray Court noted:

> Consider as an example a portion of the confession before us: The witness who read the confession told the jury that the confession (among other things) said,
>
> Question: Who was in the group that beat Stacey?
> Answer: Me, deleted, deleted, and a few other guys."
>
> Why could the witnesses not, instead, have said:
>
> Question: Who was in the group that beat Stacey?
> Answer: Me and a few other guys.

523 U.S. at 196 (internal quotations and citations omitted). Second, we previously approved a procedure almost identical to

21

the one used here.  In <u>United States v. Akinkoye</u> we approved the admission of a confession where "the prosecutor had the confessions retyped, and replaced the defendants' respective names with the phrase 'another person' or 'another individual.'" 185 F.3d 192, 198 (4th Cir. 1999).  Because of "the neutral phrases used in the statements[,] the defendants were not prejudiced in any way."  <u>Id.</u>

The use in this case of "someone else" is no different from the use in <u>Akinkoye</u> of "another person" or "another individual." We conclude that there was no violation of Woods's Confrontation Clause rights when the investigating FBI agent testified about Johnson's confession.

IV.

Appellants' convictions are hereby affirmed.

<u>AFFIRMED</u>