PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 00-4584

CATALIN LIVIO BUCULEI,
Defendant-Appellant.

THE CENTER FOR INDIVIDUAL RIGHTS,
Amicus Curiae.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, District Judge.
(CR-99-332-WMN)

Argued: June 7, 2001

Decided: August 17, 2001

Before WILKINSON, Chief Judge, and MICHAEL and
KING, Circuit Judges.

_____

Affirmed by published opinion. Judge King wrote the opinion, in
which Chief Judge Wilkinson joined. Judge Michael wrote an opinion
concurring in part and dissenting in part.

_____

COUNSEL

ARGUED: Elizabeth Linn Pearl, Assistant Federal Public Defender,
Greenbelt, Maryland, for Appellant. Hans Frank Bader, CENTER
FOR INDIVIDUAL RIGHTS, Washington, D.C., for Amicus Curiae.

Barbara Slaymaker Sale, Assistant United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** James Wyda, Federal Public Defender, Greenbelt, Maryland, for Appellant. Michael E. Rosman, Kristofor J. Hammond, CENTER FOR INDIVIDUAL RIGHTS, Washington, D.C., for Amicus Curiae. Lynne A. Battaglia, United States Attorney, Baltimore, Maryland, for Appellee.

_____

## OPINION

KING, Circuit Judge:

Catalin Buculei appeals his convictions and sentence in the District of Maryland under 18 U.S.C. § 2251(a)[1] and § 18 U.S.C. § 2251A(b)(2).[2] These convictions arose from Buculei's activities surrounding three automobile trips he made between New York and Maryland in early 1999, with the intention of engaging in sexual activity with a minor, and to carry out his attempt to create in Maryland a visual depiction of a minor engaged in sexually explicit conduct. For the reasons set forth below, we affirm.

_____

**1** Section 2251(a) provides, in pertinent part, that:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, shall be punished as provided under subsection (d), if such person knows or has reason to know that such visual depiction will be transported in interstate or foreign commerce or mailed[.]

**2** Section 2251A(b)(2) provides, in pertinent part, as follows:

> (b) Whoever purchases or otherwise obtains custody or control of a minor . . .
>
> (2) with intent to promote . . .
>
> (A) the engaging in of sexually explicit conduct by such minor for the purpose of producing any visual depiction of such conduct . . .
>
> shall be punished by imprisonment for not less than 20 years[.]

2

I.

In December of 1998, Buculei, who was then thirty-eight years of age and living in New York City, began chatting on the Internet with a thirteen-year-old girl named Megan, who lived in Maryland. Megan, who was having trouble with her family and at school, apparently turned to Buculei for support and friendship. Soon thereafter, the pair began conversing on the telephone, and they made plans to meet on January 18, 1999, near Megan's home. On that date, Buculei drove from New York to Maryland, rented a room at a motel, and waited approximately two hours for Megan to arrive at the agreed-upon rendezvous point. Megan, however, chose not to go through with the encounter. Buculei then remained in Maryland, and he unsuccessfully attempted the next day to telephone Megan at her middle school. He thereupon returned to New York.

Undeterred by Megan's failure to show up for the first meeting, Buculei made new arrangements to see her. He returned to Maryland and attempted to meet her just four days later, January 22, 1999, which was also Megan's fourteenth birthday. Megan, however, was grounded, and she was not allowed by her parents to leave her home or use the Internet or telephone. Buculei was nonetheless determined to see her again. He sent an e-mail to one of Megan's friends to confirm his plans, and on this occasion his efforts proved successful. Megan sneaked out of her home at 2:00 a.m. on January 23, 1999, meeting Buculei at the end of her street. He gave her a rose and a hug, and she got into his automobile, believing they would "[j]ust drive around." J.A. 39.

Buculei, however, had other intentions. He drove Megan to a Red Roof Inn in Aberdeen, Maryland, about thirty to forty-five minutes from her home. Buculei registered in the motel, obtained some sodas and snacks, and took Megan to his room. The pair briefly watched television while they ate. When they finished eating, Buculei gave Megan a clear drink that he had retrieved from his vehicle. At trial, Megan testified that the drink tasted "different," and it made her feel "[d]izzy and tired." J.A. 37.

Buculei then removed a video camera from his backpack and put it on a table in the motel room, with the camera's lens facing the bed

3

on which he and Megan lay. He told Megan that, notwithstanding the red light that was illuminated on the front of the video camera, the camera was not working. Buculei and Megan then began to kiss each other, and eventually Buculei removed all of Megan's clothes, as well as his own. He then touched and put his mouth on her breasts and vagina, placed his penis in her mouth, and ultimately engaged in vaginal intercourse with Megan.

Following the sexual encounter at the motel, Buculei drove Megan back to the street on which she lived, and she exited his vehicle. She "fell a few times" before making it home, however, because she was still dizzy. J.A. 63-64. Megan was back in bed at home before her father awoke at 6:00 a.m., and she did not tell her parents anything about Buculei or the events of the early morning hours.

During the following week, Buculei telephoned Megan several times, continuously expressing his desire to return to Maryland to visit her. Megan, however, advised Buculei that she did not want him to return. In any event, he came back to Maryland from New York less than two weeks later, on February 5, 1999, meeting Megan soon after she was dropped off by her school bus. Megan again got into Buculei's automobile, and he drove her back to the Red Roof Inn. This time Megan refused to go into the motel with Buculei, so he returned her to her home. Although Megan believed that Buculei would then be departing for New York, he instead appeared later that night at a roller skating rink she regularly attended. Megan became frightened, and she advised her friend's mother about her situation with Buculei. Later that evening the authorities were called and Megan was interviewed.

Early the next morning, February 6, 1999, the police arrived at Buculei's motel room. Buculei answered the door and consented to searches of his motel room and his automobile. The searches uncovered, among other items, a video camera loaded with a fully rewound videotape suitable for recording, a Polaroid camera, several condoms, lubricants, an unopened bottle of a ready-made Long Island Iced Tea alcoholic drink,[3] and a bottle of Viagra. Later that day, Buculei gave

_____

[3] The ingredients of the Long Island Iced Tea included rum, vodka, gin, tequila, and triple sec.

4

a taped statement to the authorities. He claimed he had not met Megan prior to the previous day, insisting that he had rebuffed her upon learning her real age. Buculei was then detained while a search warrant was obtained for his residence in New York.

On February 9, 1999, the FBI searched Buculei's New York apartment. The search uncovered numerous images of child pornography, correspondence between Buculei and several young girls, and the videotape of his January 23, 1999 encounter with Megan at the Red Roof Inn located in Aberdeen. The videotape does not contain footage of any sexually explicit conduct, however, apparently because Buculei had failed to fully rewind the tape when he commenced recording. Instead, only the last ten minutes of the videotape contain footage of the January 23 encounter, and the video reaches its end immediately before Buculei removed Megan's bra.

Buculei was thereafter indicted in the District of Maryland for five separate violations of federal law. In Counts One, Four, and Five of the indictment, Buculei was charged with violating 18 U.S.C. § 2423(b) (traveling in interstate commerce with the intent to engage in a sexual act with a person under the age of eighteen). These three counts represented each of Buculei's three automobile trips between New York and Maryland in early 1999. In Count Two, Buculei was charged with a violation of 18 U.S.C. § 2251(a), i.e., that he knowingly employed, used, persuaded, induced, and enticed Megan, a minor, to engage in "sexually explicit conduct for the purposes of producing a visual depiction of such conduct," knowing that "such visual depiction would be transported in interstate commerce." See supra, note 1. In Count Three, Buculei was charged with violating 18 U.S.C. § 2251A(b)(2), i.e., that he knowingly obtained "custody or control" of a minor, that is, Megan, with the "intent to promote the engaging in of sexually explicit conduct by such minor for the purpose of producing a visual depiction of such conduct[.]" See supra, note 2.

Buculei entered a plea of not guilty to the charges, and he was tried by a jury on the indictment. At the close of the Government's case-in-chief, and again at the close of all the evidence, Buculei moved for judgment of acquittal on all counts under Rule 29 of the Federal Rules of Criminal Procedure, which the district court denied. Buculei was then convicted by the jury on all five counts, and he was sentenced

5

to the maximum possible imprisonment on Counts One, Two, Four, and Five.[4] He was sentenced to the statutory minimum of 240 months' imprisonment on Count Three, with all five sentences to run concurrently.

In this appeal, Buculei assigns error to his convictions on Counts Two and Three, and he also asserts error with respect to a pair of sentencing enhancements he received on Count Two. In sum, Buculei contends that, as to Count Two, his conduct did not affect interstate commerce such that it was constitutionally permissible for him to be convicted of a federal crime, and that, as to Count Three, he did not "obtain custody or control of a minor" as contemplated by 18 U.S.C. § 2251A(b)(2).

II.

A.

We first address Buculei's contention that his conviction under Count Two, for having violated the provisions of 18 U.S.C. § 2251(a), cannot stand because that statute, as applied to his conduct in this case, is unconstitutional. We review de novo a challenge to the constitutionality of a federal statute. United States v. Mento, 231 F.3d 912, 917 (4th Cir. 2000), petition for cert. filed, ___ U.S.L.W. ___ (U.S. Jan. 22, 2001) (No. 00-8114).

B.

The Government has stipulated that the videotape of Megan and Buculei, made at the Red Roof Inn in Aberdeen, Maryland, on the morning of January 23, 1999, does not contain a visual depiction of any sexually explicit conduct, since the tape came to its end immediately before Megan was completely undressed.[5] However, § 2251(a)

_____

[4] On Counts One, Four, and Five, Buculei was sentenced to 24 months' imprisonment. On Count Two, Buculei was sentenced to 168 months' imprisonment.

[5] In this vein, Buculei also asserts that the evidence was insufficient for the jury to conclude that he intended to produce a visual depiction of his

6

criminalizes "employ[ing], us[ing], persuad[ing], induc[ing], or coerc-
[ing]" a minor to engage in "sexually explicit conduct <u>for the purpose
of producing</u> any visual depiction of such conduct . . . if such person
knows or has reason to know that such visual depiction will be trans-
ported in interstate or foreign commerce[.]" § 2251(a) (emphasis
added). That Buculei was unsuccessful in his attempt to actually pro-
duce a visual depiction of sexually explicit conduct, with Megan as
its star, does not, therefore, require his acquittal on Count Two, that
he violated § 2251(a). Assuming the jurisdictional commerce require-
ment was satisfied, <u>see infra</u>, the federal crime charged in Count Two
was complete when Buculei induced Megan into sexually explicit
conduct for the purpose of producing a visual depiction thereof.

Buculei contends, however, that his foiled attempt to produce a
visual depiction of a minor engaging in sexually explicit conduct --
one step removed from his intent to transport it in interstate com-
merce -- does not, if no such visual depiction is actually produced,
constitute an activity that may be regulated by Congress. Buculei
asserts, in this regard, that his Count Two conviction offends the prin-
ciples announced by the Supreme Court in <u>United States v. Lopez</u>,
514 U.S. 549 (1995). The Court determined in <u>Lopez</u> that a statute
represents a valid and constitutional exercise of Congress's constitu-
tional authority to regulate interstate commerce if it: (1) regulates the
use of the channels of interstate commerce; or (2) regulates and pro-

_____

sexual activity with Megan. As noted above, we review sufficiency chal-
lenges by viewing the evidence in the light most favorable to the Govern-
ment. <u>Glasser v. United States</u>, 315 U.S. 60, 80 (1942). Buculei contends
that the evidence established an exculpatory "deliberate effort" by him to
preserve the footage at the beginning of the tape (and not tape his
encounter with Megan). Buculei insists "[t]he tape contained several
minutes of obviously sentimental footage of an elderly gentleman from
New Orleans." By its verdict, the jury obviously rejected this theory, and
it concluded that Buculei did not intend the videotape to run out prior to
a visual depiction of sexually explicit conduct being created. The evi-
dence in support of the verdict is more than sufficient given that: (1) the
videotape in question came so close to capturing sexually explicit con-
duct; and (2) the jury could readily infer that Buculei intended to avoid
the same mistake by bringing a fully rewound videotape to Maryland on
his third visit.

7

tects the instrumentalities of interstate commerce, or persons or things in interstate commerce; or (3) regulates those activities that substantially affect interstate commerce. Id. at 558-59. Because we conclude that the evidence of Buculei's conduct with respect to the charge in Count Two fully satisfies the third prong of Lopez, we need only address that facet of the Lopez analysis.

In its subsequent decision in United States v. Morrison, 529 U.S. 598 (2000), the Court enumerated four factors for lower courts to consider in analyzing whether an activity substantially affects interstate commerce. In such an endeavor, we are bound to inquire with respect to the following: (1) whether the statute relates to an activity that has something to do with "`commerce' or any sort of economic enterprise, however broadly one might define those terms"; (2) whether the statute contains an "express jurisdictional element which might limit its reach" to activities having "an explicit connection with or effect on interstate commerce"; (3) whether congressional findings in the statute or its legislative history support the judgment that the activity in question has a substantial effect on interstate commerce; and (4) whether the link between the activity and a substantial effect on interstate commerce is attenuated. Id. at 610-13.

In examining the four Morrison factors in light of the evidence and the charge made in Count Two, we are convinced that Buculei's activities had a substantial effect on interstate commerce. First, there can be no doubt that the production of visual depictions of minors engaging in sexually explicit conduct, i.e., child pornography, is economic in nature. See United States v. Kallestad, 236 F.3d 225, 228 (5th Cir. 2000) (concluding the same with regard to the intrastate possession of child pornography, and citing a 1986 report of the Attorney General's Commission on Pornography finding that much of the interstate traffic in child pornography "involves photographs taken by child abusers themselves") (internal citations omitted). Moreover, as explained in Kallestad, the Court's long-standing decision in Wickard v. Filburn, 317 U.S. 111 (1942), stands for the proposition that when a person "produces for their own consumption a product that is traded in interstate commerce, his conduct is economic in nature." Kallestad, 236 F.3d at 228 (citing Wickard, 317 U.S. at 114); see also United States v. Rodia, 194 F.3d 465, 473-77 (3d Cir. 1999) (using Wickard analysis to conclude that intrastate possession of visual depictions of

8

minors engaged in sexually explicit conduct could affect the interstate child pornography market).

Second, § 2251(a) contains an explicit jurisdictional element. It mandates, in pertinent part, as the indictment alleged, that the defendant "knows or has reason to know that such visual depiction will be transported in interstate or foreign commerce or mailed[.]" § 2251(a). The jury in this case was charged appropriately on this issue, and it found that the Government had satisfied that element of the offense. Moreover, this jurisdictional element represents a limitation of § 2251(a) to a discrete set of activities-- defendants who plan to transport visual depictions of minors engaged in sexually explicit conduct in interstate commerce -- which is exactly what the Court seems to have had in mind in Lopez.

Third, there are ample congressional findings to support the proposition that production and possession of child pornography substantially affect interstate commerce. See S. Rep. No. 95-428, at 4-6 (1977), reprinted in 1978 U.S.C.C.A.N. 40 ("[C]hild pornography and child prostitution have become highly organized, multimillion dollar industries that operate on a nationwide scale. . . .[T]he sale and distribution of such pornographic materials are carried on to a substantial extent through the mails and other instrumentalities of interstate and foreign commerce[.]"). The Fifth Circuit, in its Kallestad decision last year, also discussed how child pornography production impacts upon interstate commerce:

> As the 1986 Attorney General's Commission on Pornography found, much of the interstate traffic in child pornography "involves photographs taken by child abusers themselves, and then either kept or informally distributed to other child abusers." See Attorney General's Commission on Pornography: Final Report 406 (U.S. Dep't of Justice, 1986). Such pornography is exchanged through the mails, and also becomes the basis for commercial child pornography magazines, which are made not with photographs taken by the magazine producers, but rather with homemade photographs submitted by private child abusers. Id. at 407-08.

9

Kallestad, 236 F.3d at 228. Without a doubt,"Congress's conclusion that a substantial interstate market in child pornography exists seems an eminently reasonable one." Rodia, 194 F.3d at 475.

Finally, there is no question that the link between the activity in question (attempted creation of a visual depiction of a minor engaged in sexually explicit conduct) and interstate commerce is not in any way attenuated. We emphasize that Buculei's failure to create the visual depiction does not bolster his contention that the Constitution has been offended by his conviction. If Congress has the power, under the Commerce Clause, to regulate the completed product, it can certainly regulate the attempted production of child pornography.[6]

Here, the evidence clearly established, to the satisfaction of the jury, that Buculei intended to produce visual depictions of Megan engaging in sexually explicit activity in Maryland, and also intended to transport such visual depictions in interstate commerce from Maryland to New York. Congress, in its wisdom, has rationally determined that eliminating such pernicious activity will reduce the enormous interstate market in child pornography.

Furthermore, because Congress has chosen to directly regulate the interstate market for which child pornography exists, this case is dis-

_____

[6] Moreover, the Government did not, in its prosecution of Buculei, rely on the alternative jurisdictional hook spelled out in § 2251(a), i.e., that the materials used for the visual depiction were transported in interstate commerce. Cf. Rodia, 194 F.3d at 473 (noting that "the requirement that precursor materials like film or cameras moved in interstate commerce -- is only tenuously related to the ultimate activity regulated: intrastate possession of child pornography"); Kallestad, 236 F.3d at 228-29. We have no reason to express an opinion on the constitutional firmness of this alternative jurisdictional theory, since it was not utilized by the Government. However, we point out that both Rodia and Kallestad involved prosecution for the possession of visual depictions of minors engaged in sexually explicit activity, pursuant to § 2252(a)(4)(B), and the jurisdictional element utilized was that the materials, such as film and cameras, moved in interstate commerce. In this case, the defendant himself, for the sole purpose of attempting to create such visual depictions, transported the camera in interstate commerce between New York and Maryland. In such a situation, the link with interstate commerce is more compelling.

10

tinguishable from <u>Lopez</u> and <u>Morrison</u>, each of which involved issues where Congress sought to regulate certain activities under the assumption that they substantially affected interstate markets for other activities. It is important in the analysis and application of <u>Wickard</u> that, in this instance, Congress is regulating the very thing (i.e., child pornography) for which an interstate market exists. The impact on interstate commerce of the wheat at issue in <u>Wickard</u> is analytically indistinguishable from the impact of child pornography under consideration here. On the other hand, the same cannot be said of the gun possession in a school zone considered in <u>Lopez</u>, or the violence against women examined in <u>Morrison</u>. (In both of which the government's contentions were that the activities in question substantially affected interstate markets for <u>other</u> activities. <u>See e.g.</u>, <u>Morrison</u>, 529 U.S. at 615 (rejecting the contention that violence against women substantially affects markets for interstate travel, employment, business transactions, medical services, and consumer products).) Where the effect on other markets is at stake, the issue of substantiality may be more of a concern.

In summary, we agree with the Government on this issue, and we conclude that § 2251(a) is a valid exercise of congressional authority to regulate child pornography activities affecting interstate commerce. We therefore affirm Buculei's conviction under Count Two.**7**

III.

A.

We next consider Buculei's claims of error with respect to his prosecution under 18 U.S.C. § 2251A(b)(2), as embodied in Count Three

_____

**7** As mentioned <u>supra</u>, Buculei also assigns error to two sentencing enhancements he received under Count Two. One enhancement was imposed pursuant to U.S.S.G. § 2G2.1(b)(2) and the second was imposed pursuant to U.S.S.G. § 2G2.1(b)(3). Buculei requests that we reverse his sentence on Count Two only if we also reverse his conviction under Count Three (since his adjusted offense level under Count Two is still lower than the base level of his conviction pursuant to Count Three). Since we sustain his conviction on Count Three, <u>see</u> Part III, <u>infra</u>, we have no reason to address Buculei's contentions in this regard.

11

of the indictment. Buculei makes two assertions in support of his theory that his conviction on Count Three must be vacated. First, he contends that the statute, entitled "Selling or buying of children," encompasses only the "custody or control" of children that is of the "same degree of control as that exercised by a parent or guardian." Appellant's Br., at 14. Second, Buculei insists that, even if the statutory provisions reach his conduct, the doctrine of fair notice and the rule of lenity require that a judgment of acquittal be granted on his Count Three conviction. The Government counters that, notwithstanding the statute's title, the plain language contained in § 2251A(b) clearly encompasses and prohibits Buculei's conduct.

B.

Our analysis of the scope of § 2251A(b) presents a question of law, which we review de novo. See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 497-98 (1982). In assessing a statute's scope, we must "look first at its language. If the language is unambiguous, ordinarily it is to be regarded as conclusive unless there is `a clearly expressed legislative intent to the contrary.'" Dickerson v. New Banner Inst., Inc., 460 U.S. 103, 110 (1983) (quoting Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980) (other internal citations omitted)); United States v. Sheek, 990 F.2d 150, 152-53 (4th Cir. 1993) ("In determining the scope of a statute the court must first look to its language.").

Once we have ascertained the scope of § 2251A(b) and determined that it potentially encompasses Buculei's conduct, we are then called upon to decide whether the evidence was sufficient for the jury to conclude that Buculei's conduct fell within the statute's prohibitions. In conducting such a review, we must view the evidence in the light most favorable to the Government. United States v. Akinkoye, 185 F.3d 192, 200 (4th Cir. 1999).

C.

First of all, Buculei strenuously asserts that the title of § 2251A(b), as well as its legislative history and overall structure, compel our conclusion that it only contemplates parental control, or some similar degree of control as that exercised by a parent. In this regard, it is

12

important to recognize that "the title of a statute cannot limit the plain meaning of the text. For interpretive purposes,[the title] is of use only when it sheds light on some ambiguous word or phrase." Pennsylvania Dep't of Corrections v. Yeskey, 524 U.S. 206, 212 (1998) (quoting Trainmen v. Baltimore & Ohio R.R. Co., 331 U.S. 519, 528-29 (1947) (alterations omitted)). Indeed, the terms contained in the title of § 2251A(b) -- buying and selling -- do not exclusively define the statute's reach: its provisions also apply to "[w]hoever purchases or otherwise obtains custody or control of a minor[.]" Furthermore, the statutory term "custody or control" is clearly defined in 18 U.S.C. § 2256(7) as "includ[ing] temporary supervision over or responsibility for a minor whether legally or illegally obtained[.]" Thus, it cannot be successfully asserted by Buculei that the title of § 2251A somehow limits its reach, and we reject his argument in that regard.

Examining the statute further, we are similarly unconvinced that § 2251A's coverage does not extend to those situations where a stranger gains "control" of a minor without any sort of parental consent or knowledge.[8] That the provisions of a statute may authorize prosecutions in "situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." Yeskey, 524 U.S. at 212 (quoting Sedima S.P.R.L. v. Imrex Co., 473 U.S. 479, 499 (1985)). Buculei's contention that, if this statute is read in the way advocated by the Government, it conflicts with -- and provides higher minimum penalties than -- § 2251(a) (which Buculei was convicted of violating with respect to Count Two) is unavailing. The difference between these statutes is not merely the element of "parental or quasi-parental" control, it is fundamentally the element of "control" itself. Under § 2251(a), a person is prohibited from "employ[ing], us[ing], persuad[ing], induc[ing], or coerc[ing] any minor to engage in . . . sexually explicit conduct for the purpose of producing [a] visual depiction of such conduct[.]" On the other hand, the "control" element of § 2251A(b) (on which Count Three is predicated) involves something more than mere persuasion, inducement, or coercion.[9] The

_____

[8] Although Count Three alleged that Buculei obtained "custody or control" of Megan, the Government apparently abandoned any effort to prove the indictment's allegation of "custody." It sought only to prove to the jury the allegation of "control." See infra, note 9.
[9] Buculei insists on appeal that he "was convicted based solely on his psychological coercion of Megan into making child pornography." Reply

13

jury -- which viewed the limited videotape which Buculei made of his encounter with Megan at the Red Roof Inn -- was entitled to conclude, as it did, that Buculei's conduct fully satisfied this element of the charged offense.**10** Put simply, Buculei has not demonstrated any-

_____

Br., at 6. We need not decide whether psychological control would be sufficient under the statute, since Buculei's assertion is belied by the evidence and the charge to the jury. The district court-- upon the joint request of the parties and without objection -- instructed the jury:

> Control, as used here, means the power to manage, command, direct or restrain another person. In this case, the government contends that Mr. Buculei obtained control over Megan C. by, among other things, taking her to a motel and giving her an intoxicating drink.

> The government must prove beyond a reasonable doubt that the defendant obtained control over Megan C. by the use of the intoxicating drink and other means in order to find him guilty of the charge in Count Three.

> Even if you find that the defendant did give Megan C. an intoxicating beverage, you must consider whether he obtained control over her as I have defined that term.

We see no error in the jury instruction, which fairly encompasses the plain language of the statute, and which is consistent with both the legislative history of § 2251A and its overall structure and purpose. Buculei was not convicted of coercing Megan; instead, the jury reasonably found that, based on the entirety of the evidence, Buculei exercised the required statutory "control" over Megan.

**10** We are similarly unconvinced by Buculei's argument that, if we accept the Government's reading of the statute, all child pornographers would be subject to prosecution under § 2251A(b), since "very few, if any, children would willingly participate in sexual activity in order to make child pornography." It occurs to us that children may well be enticed into production of child pornography, as is often the case, see, e.g., Cong. Rec. S13326-01; 1988 WL 176238 (Sept. 17, 1988) (Reader's Digest article in legislative history of § 2251A which details the many ways child pornographers lure their unsuspecting victims), or they might be forced into such sexually explicit activity against their will -- by someone exerting custody or control of them. This latter example is the more egregious crime that Congress criminalized in § 2251A(b).

14

thing that would compel us to override the plain language of § 2251A(b).

D.

Buculei next contends that the doctrine of fair notice and the rule of lenity require that his conviction on Count Three be vacated. However, Buculei's ability to "articulat[e] a narrower construction [of § 2251A(b)(2)] . . . does not by itself make the rule of lenity applicable." Smith v. United States, 508 U.S. 223, 239 (1993); see also Moskal v. United States, 498 U.S. 103, 108 (1990). We need not "determine the precise contours" of the statute if Buculei's conduct is reasonably encompassed by the statute's provisions. Smith, 508 U.S. at 238-39.

Moreover, it is irrelevant that Buculei's prosecution under this statute is "a novel construction," or that it is the first time the Government has proceeded under this theory. See United States v. Knox, 32 F.3d 733, 751 n.15 (3d Cir. 1994) ("[T]he rule of lenity is not dependent whatsoever on whether there have been successful prosecutions under the statute at issue. . . . [Otherwise] the government [would never] be able to successfully proceed under a theory different from that which has yielded convictions in the past."). In short, Buculei's conduct with respect to Megan clearly falls within the plain language of § 2251A(b)(2). See Moskal, 498 U.S. at 108-09. That Congress may not have foreseen a situation where a stranger from New York could exercise "control" over a fourteen-year-old girl from Maryland, with such control not derived (legally or illegally) from the parent or guardian, simply does not affect our conclusion. If the statute unambiguously reaches the defendant's conduct, as it does here, our inquiry is complete. See United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989). Thus, we must affirm Buculei's conviction on Count Three, the violation of 18 U.S.C. § 2251A(b). **11**

_____

**11** The amicus curiae has endeavored to persuade us that Buculei's Count Three conviction, as well as his three convictions under § 2423(b), offends the Commerce Clause of the Constitution. Because Buculei did not raise any such issues below or on appeal, they have been waived, and we express no view on them. See Singleton v. Wulff, 428 U.S. 106, 121

15

IV.

Pursuant to the foregoing, we affirm the convictions and sentence of Buculei as rendered and imposed in the district court.

AFFIRMED

MICHAEL, Circuit Judge, concurring in part and dissenting in part:

I concur in all but part III of the majority opinion. I disagree, however, that there is sufficient evidence to support a finding that Buculei obtained "custody or control" over Megan C. as required by 18 U.S.C. § 2251A(b). The "custody or control" requirement of § 2251A means that a defendant must exert a significant degree of authority over the minor. In all events, § 2251A must be interpreted as outlawing conduct that is more serious than the lesser-included offense of § 2251(a), which makes it unlawful to employ, use, persuade, induce, entice, or coerce a minor for the purpose of producing child pornography. While Buculei certainly persuaded, induced, and enticed Megan, he never possessed authority over her that amounted to "custody or control." Accordingly, I respectfully dissent from the majority's affirmance of Buculei's conviction on the one count brought under § 2251A(b).

There are two primary offenses dealing with the use of minors in producing child pornography. The baseline offense is § 2251(a), which prohibits the "employ[ment], use[ ], persua[sion], induce[ment], entice[ment], or coerc[ion]" of a minor for the purpose of producing child pornography. Section 2251A, on the other hand, deals with more serious conduct (and carries substantially stiffer penalties) than does § 2251(a).* Titled the "Selling or buying of children,"

_____

(1976); Amoco Oil Co. v. United States, 234 F.3d 1374 (Fed. Cir. 2000) ("Because these constitutional arguments were not raised in Amoco's opening brief, we decline to address them. . . .[A]n appellant and an amicus may not split up the issues and expect the court to consider that they have all been raised on appeal."); Christopher M. v. Corpus Christi Indep. Sch. Dist., 933 F.2d 1285, 1293 (5th Cir. 1991) ("[A]n issue waived by appellant cannot be raised by amicus curiae.")
*Absent special circumstances, § 2251(a) carries a minimum sentence of 10 years and a maximum of 20. Section 2251A carries a minimum of 20 years and a maximum of life.

16

§ 2251A has two parts. Section 2251A(a) prohibits a parent, legal guardian, or other person having "custody or control" of a minor from selling or transferring custody or control of the minor for the purpose of producing child pornography. Section 2251A(b), in turn, prohibits any person from buying or obtaining "custody or control" of a minor for the purpose of producing child pornography.

To have "custody or control," the defendant must exert a significant degree of authority over the minor. The plain meaning of the words "custody" and "control" compels this conclusion. The word "control" is defined in the dictionary as the "<u>power</u> or <u>authority</u> to guide or manage." <u>Webster's New International Dictionary</u> 496 (3d ed. 1993) (emphasis added). Likewise, "custody" is defined as the "act or duty of <u>guarding</u> and preserving." <u>Id.</u> at 559 (emphasis added). The statutory definition likewise confirms that the minor must be under the defendant's authority: "custody or control" includes "temporary supervision over or responsibility for a minor whether legally or illegally obtained." <u>Id.</u> § 2256(7).

In addition to the plain language of § 2251A and the statutory definition, other factors confirm that it takes a significant degree of authority to have "custody or control" of a minor. First, § 2251A must be interpreted in light of the lesser-included offense of § 2251(a). Again, § 2251(a) prohibits the "employ[ment], use[ ], persua[sion], induce[ment], entice[ment], or coerc[ion]" of a minor for the purpose of producing child pornography. To avoid making § 2251A redundant, "custody or control" must be interpreted to involve something more authoritative than employment, use, persuasion, inducement, enticement, or coercion. <u>See, e.g.</u>, <u>Freytag v. Comm'r</u>, 501 U.S. 868, 877 (1991) (stating that courts should avoid interpreting one statute in a way that makes another statute redundant). If "custody or control" is equated with a significant degree of authority, § 2251A and § 2251(a) stand apart from each other and cover separate crimes. Otherwise, they do not. Second, the words surrounding "custody or control" in § 2251A(a) suggest that a significant degree of authority is required. <u>See, e.g.</u>, <u>Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.</u>, 515 U.S. 687, 695 (1995) ("[A] word is known by the company it keeps."). The section prohibits a "parent," "legal guardian," or "other person having custody or control" of a minor from selling or handing over the minor for use in child pornography. By

17

placing a person with "custody or control" in the same class as a "parent" and "legal guardian," Congress surely meant that a person with custody or control will have significant authority and power over the minor. Third, the statute's title sheds light on the meaning of "custody or control." <u>See, e.g.</u>, <u>Castillo v. United States</u>, 530 U.S. 120, 125 (2000) (using the statute's title as part of the Court's statutory interpretation analysis). Section 2251A is titled the "Selling or buying of children." This suggests that the section targets defendants who have significant power over their victims, specifically, the power to sell or buy them. Fourth, the structure of section 2251A reveals what is required for custody or control. Here, I repeat that section 2251A(a) prohibits a parent, legal guardian, or any other person having "custody or control" of a minor from selling or transferring custody or control of the minor for the purpose of producing child pornography. This means that a person with "custody or control" of a minor will have enough power and authority over the minor to sell her or transfer custody or control of her to a third person. Section 2251A(b), the basis for the third count against Buculei, prohibits a person from buying or otherwise obtaining custody or control of a minor for the purpose of producing child pornography. Once a person, like Buculei, buys or obtains custody or control of a minor, he would surely be obtaining power and authority equal to that necessary for custody or control under § 2251A(a), that is, sufficient power and authority over the minor to re-sell her or re-transfer custody or control. As I will explain, the evidence does not establish that Buculei had that sort of power and authority over Megan. This is the case, notwithstanding the strict standard of review: "The verdict of [the] jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." <u>Glasser v. United States</u>, 315 U.S. 60, 80 (1942).

The majority concludes that the effect of the "clear" drink gave Buculei custody or control over Megan. I disagree. At the motel Megan drank less than one-half cup of a clear drink which made her feel "dizzy and tired." Megan's testimony, however, reveals that the drink did not significantly impair her judgment or her ability to function. She remained quite lucid, even reminding Buculei several times that it was getting late and that she had to be home by 6:00 a.m. Megan was able to recount the entire night's experience with Buculei in vivid detail. She remembered many particulars that were incidental.

18

For example, she recalled that she was wearing two shirts, but not a belt; that Buculei got undressed all at once; that the motel room had two beds, a table and chair, and paper cups; that the room had a sink area that was separate from the bathroom; and that the television was turned on. Megan did not testify that the drink had any effect on her other than making her dizzy and tired. For example, she did not say that the drink made her act differently, that it was in any way a factor in bringing about the events that unfolded, or that it impaired her ability to reason. In short, Megan's testimony reveals that the drink had the limited effect of making her somewhat dizzy and tired. Because the drink had such a limited effect, it did not give Buculei custody or control over Megan.

The evidence strongly supports a finding that Buculei persuaded, induced, and enticed Megan to have sex with him for the purpose of producing child pornography in violation of § 2251(a), as charged in count two. The evidence, however, does not show that Buculei had "custody or control" of Megan. I would therefore vacate Buculei's conviction on count three and remand for resentencing on the remaining four counts.

19