# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 02-2086

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

KENNETH J. RANEY,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 CR 557—**James B. Moran**, *Judge.*

———————

ARGUED MAY 22, 2003—DECIDED AUGUST 20, 2003

———————

Before BAUER, KANNE, and ROVNER, *Circuit Judges.*

KANNE, *Circuit Judge.* On the spring afternoon of June 13, 2001, thirty-eight-year-old Kenneth J. Raney pulled his gray station wagon into the parking lot of a McDonald's restaurant in Forest Park, Illinois. He parked the car, walked inside the restaurant to a pay phone, and called a fourteen-year-old girl named "Dena" to tell her that he was there, waiting for her. He and Dena had been exchanging e-mails for the past three months at an Internet chatroom entitled, in relevant part, "I LOVE OLDER MEN." Raney believed that Dena was a young virgin, who wanted to have sex with him and was willing to let him take photographs of the acts.

Fortunately, Dena was only a figment of Raney's imagination, conjured up by Cook County (Illinois) deputy sheriff William Plahm, who had played the role of Dena during the three-month Internet exchange, and deputy sheriff Janet Montecelo, who had posed as Dena in some photographs that Officer Plahm had e-mailed to Raney and who on occasion had answered Raney's telephone calls to Dena.

Raney and Dena had begun chatting on April 24, 2001. Officer Plahm, identifying himself by the username "ilgirl4u" entered the "I LOVE OLDER MEN" chatroom and was immediately contacted by Raney, who, employing the username "mastericeman," requested a private communication. During this first chat, Raney claimed to be "Ken," a thirty-eight-year-old man from southern Wisconsin. After learning that the user "ilgirl4u" was claiming to be "Dena, a fourteen-year-old-girl from Forest Park, Illinois," Raney asked her, "What do you like to do with older men?" When Dena replied that she was a virgin, Raney offered to teach her personally about sexual intercourse and oral sex. To preempt any concerns she might have about pregnancy, he informed Dena, "I'm surgically safe . . . have a vacectamy [sic]." (Tr. at 46.)

Over the next several months, Raney tried to convince Dena to meet with him to have sexual intercourse and perform fellatio on him. He sent Dena nude pictures of himself. Officer Plahm, in turn, sent Raney pictures of Officer Montecelo, clothed, posing as Dena. Receipt of these pictures prompted Raney to inquire, "You have any not covering yourself up?" (Tr. at 60.) Officer Plahm also gave Raney an undercover telephone number to contact Dena to arrange for a meeting. When he called, Officer Montecelo answered and she agreed to meet Raney at the McDonald's parking lot on April 28, 2001. Dena later e-mailed Raney to postpone that meeting.

A number of the communications between Raney and Dena discussed Raney's desire to take sexually explicit pho-

tographs of her. When discussing the prospect of engaging in sexual intercourse and oral sex with her, Raney asked Dena, "you want me to take some pics of you when we are doing it?" He told her he'd "like to take some of you nude and sucking me . . . ." (Tr. at 98, 100.)

Over e-mail on June 7 and 11, 2001, Raney and Dena made plans to meet on June 13 at the McDonald's in Forest Park. Dena asked Raney whether he planned on bringing his camera with him to their meeting. Raney initially declined but then relented, saying "good, take some nudes then to [sic]" and "good, take a pic of you sucking me to [sic] and when I fuck you you'll have a pic to see that, how many girls can say that." (Tr. at 104.) Raney and Dena had two additional on-line communications regarding their planned June 13 meeting.

That morning, Raney and Dena e-mailed each other one last time before their scheduled rendevous. Raney asked Dena if she still wanted him to bring his camera. Dena replied, "If you want to, sure," to which Raney said, "I have to stop and get some film." (Tr. at 111.)

When Raney placed the call at McDonald's, it was Officer Montecelo who answered and told him that she, Dena, was on her way. Raney then returned to his car in the parking lot to wait for Dena. A short time later, Officer Montecelo walked up to Raney's car. When Raney suggested that she get in the car with him, Montecelo identified herself as a police officer and other officers lying in wait converged upon the car to arrest Raney.

After his arrest, Raney signed written consent forms authorizing agents to search his car, residence, computer, and on-line computer accounts for materials "in the nature of" child abuse, child exploitation, and child erotica. From his station wagon, police recovered a pair of swim trunks, a condom, sexual lubricant, a camera loaded with film, and an empty Kodak film box.

From his residence in Janesville, Wisconsin, police discovered and seized a large stack of photographs, which included photos of homemade amateur pornography depicting a naked Raney engaging in sex acts (sexual intercourse and oral sex) with an adult female. That female was later identified as Raney's ex-wife. Also in the stack were photos of clothed children, later identified as Raney's sons.

Police confiscated Raney's computer. Postal Inspector Ronald Redus would later conduct a forensic analysis of its hard drive, which would reveal numerous images of child pornography as well as a scanned naked photo of Raney, which he had e-mailed to Dena, several additional pieces of Raney's homemade pornography, and the photographs of Officer Montecelo, which Raney had believed to be of Dena.

Back at the scene of his arrest, Raney was advised of his constitutional rights. He signed a written *Miranda* waiver and agreed to discuss his case. The police then showed Raney copies of all the on-line communications between Raney and Dena that they had monitored.

Raney acknowledged to his arresting officers that he participated in these on-line communications as "mastericeman." Raney stated that in April 2001, he began corresponding with a person he believed to be a fourteen-year-old girl named Dena. He stated that he talked explicitly with Dena about meeting her and the possibility of the two having sex. He further admitted that he had traveled that day from Janesville, Wisconsin to Forest Park, Illinois in order to meet with Dena. He claimed, however, that his purpose in meeting her was to talk her out of having sex with him. He nonetheless admitted that had his efforts at persuasion proven unsuccessful, he might have succumbed to temptation. He also admitted to possessing four or five "father-daughter video clips," which he had obtained over the Internet.

Raney was indicted by a federal grand jury on one count of traveling in interstate commerce for the purpose of en-

gaging in a sexual act with a minor, *see* 18 U.S.C. § 2423(b) (2003), and one count of attempted manufacture of child pornography, *see* 18 U.S.C. § 2251(a) & (e) (2003).[1]

At trial, Officers Plahm and Montecelo and Inspector Redus testified regarding their knowledge of Raney's e-mail and telephone communications with Dena and the materials recovered from his computer's hard drive. The government introduced into evidence all the on-line communications between Raney and Dena, including the photographs that the two had exchanged. It also introduced the evidence found in Raney's car, which included the camera, film, empty film box, condom and sexual lubricant.

From the results of Inspector Redus's forensic analysis of Raney's computer, the government introduced into evidence six images of child pornography, which depicted young girls engaged in sexual intercourse or oral sex with adult males. The government further introduced into evidence the stack of photographs found at Raney's house. The jury viewed four of the pieces of homemade adult pornography depicting Raney engaged in sexual intercourse and oral sex with his ex-wife.

Raney testified in his own defense and denied having the intent either to have sex with Dena when he traveled to Illinois or to take sexually explicit photographs of her once

---

[1] Raney's indictment charged him with violating § 2251(a) & (d), but while this appeal was pending, Congress amended the statute by adding a new subsection (c), which prohibits the extraterritorial production of child pornography for distribution in the United States. Subsection (d) was changed—without alteration material to any of the arguments Raney asserts here—to subsection (e), and the statute's internal references were modified accordingly. *See* PROTECT Act § 10, S. Res. 151, 108th Cong. (2003) (enacted). In this opinion, we will therefore address Raney's challenges with reference to the current version of § 2251.

he arrived. He admitted that he had been communicating with Dena (and several other underage girls for that matter) in a sexually explicit manner in order to arouse himself sexually so that he could masturbate. And Raney said that he had traveled to Illinois on June 13 for the purpose of meeting Dena, but added, consistent with his post-arrest statement, that his true intentions were to dissuade her from having sex with him. He also stated that he was going to buy and sell some baseball cards in Illinois.

When confronted on cross-examination with the evidence that police had recovered a condom and sexual lubricant from his car, Raney testified that he had those items with him because he was supposed to meet an adult male named "Nathan" later that day in Elgin, Illinois. He admitted that he had never before mentioned Nathan to anyone, including his lawyer.

On the question of his intent to manufacture child pornography, Raney admitted that he had told Dena that he was going to take photos of her performing fellatio on him and of the two of them engaging in intercourse. He also admitted that he had loaded his camera with a new roll of film and had brought it with him to his meeting with Dena. He claimed, however, that in spite of his previous e-mail statements, he brought along the camera and film only to take pictures of his day with Dena and not for the purpose of taking sexually explicit photographs of her. Raney also admitted to having been in possession of child pornography, which he had downloaded from the Internet to his computer. He also admitted to having taken the homemade adult pornographic photographs that had been seized from his house.

The jury found Raney guilty on both counts of the indictment. The district court sentenced Raney to 145 months imprisonment.

Raney appeals his conviction arguing (1) that the seizure of homemade adult pornography from his home exceeded

the scope of his consent search; (2) that he was denied effective assistance of counsel when his trial attorney failed to move to suppress the homemade adult pornography; (3) that the district court erred in allowing the government to introduce the homemade adult pornography into evidence; and (4) that his indictment for attempting to manufacture child pornography was defective.

## ANALYSIS

Before trial Raney filed a motion to suppress his post-arrest statements and all the evidence seized from his car and house, arguing they were obtained as fruits of an arrest unsupported by probable cause. The motion was denied. The motion did not raise the particular argument that Raney asserts here—that the seizure of the particular items of homemade adult pornography was outside the scope of his consent. Raney has thus failed timely to raise a specific objection and by doing so has forfeited his argument. Consequently, our review is for plain error only. *United States v. Harris*, 271 F.3d 690, 700 (7th Cir. 2001). To establish plain error, Raney must show an error that was plain, that affected substantial rights, and that seriously affected the fairness, integrity, or public reputation of the proceedings. *United States v. Martin*, 287 F.3d 609, 614 (7th Cir. 2002).

We do not think it plain that the homemade adult pornography seized from Raney's apartment should have been suppressed. Raney notes that his possession of the adult pornography was perfectly legal and argues that the adult pornography seized from his home had no nexus to child abuse, child exploitation, or child erotica. Because Raney consented only to a search for evidence in the nature of child abuse, child exploitation, and child erotica, Raney argues that the four photographs depicting himself and his ex-wife in various stages of undress and participating in oral sex and sexual intercourse should have been suppressed as exceeding the scope of his consent.

We have stated that "[t]he scope of a consent search is limited by the breadth of actual consent, and whether the search remained within the boundaries of the consent is a question of fact to be determined from the totality of all the circumstances." *United States v. Torres*, 32 F.3d 225, 230-31 (7th Cir. 1994) (quotations omitted). Our standard in determining the scope of a suspect's consent is that of objective reasonableness—"what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* (quotation omitted).

We have long recognized that "[g]overnment agents may not obtain consent to search on the representation that they intend to look only for certain specified items and subsequently use that consent as a license to conduct a general exploratory search." *United States v. Dichiarinte*, 445 F.2d 126, 129 (7th Cir. 1971). In *Dichiarinte*, we found that law enforcement officers had exceeded the scope of the defendant's consent to search his home for narcotics when they read the defendant's personal papers and then seized documents implicating the defendant in tax fraud. *Id.* at 130. The defendant had authorized only a search reasonably necessary to determine the presence of narcotics. The officers exceeded the scope of that consent when they went beyond what was necessary to determine if the defendant had hidden narcotics among his personal papers and started to read the papers to determine whether they evidenced other illegal activity. *Id.* The evidence, we held, should have been suppressed.

Likewise, in *United States v. Carey*, 172 F.3d 1268 (10th Cir. 1999), the Tenth Circuit found that law enforcement officers exceeded the scope of a warrant to search a defendant's computer for documentary evidence "pertaining to the sale and distribution of controlled substances" when their search of the defendant's hard drive uncovered evidence of possession of child pornography. *Id.* at 1272-73.

During the search of the hard drive, law enforcement came across a number of files labeled ".JPG." Upon opening the first ".JPG" file, the agent found an image of child pornography. Rather than getting a separate warrant to search the other ".JPG" files, the agent continued to open them and uncover additional child pornography. The Tenth Circuit found that the agent had exceeded the scope of the warrant by continuing to open the ".JPG" files after the initial file revealed child pornography because the warrant was limited to a search for narcotics-related evidence. *Id.* at 1274-76.

From these cases and others like them, *see, e.g.*, *United States v. Turner*, 169 F.3d 84, 85 (1st Cir. 1999) (upholding suppression of child pornography where search of computer files exceeded the scope of consent search), Raney argues the seizure of the photographs was improper because the photos did not depict a minor in a sexually explicit manner and thus were not within the scope of his consent. The government makes no argument in response that it was reasonable for law enforcement to have suspected that the woman depicted was a child. (Having viewed the photos, it would not have been reasonable so to have suspected.) Nor does the government attempt the strained argument that possession of adult pornography in general, including commercial adult pornography, is somehow material "in the nature of" child erotica or probative of Raney's intent to manufacture child pornography.

Instead, it is the *homemade* nature of the photos and the particular sex acts depicted therein in combination with Raney's clearly stated intention to make *homemade* child pornography with Dena depicting those very same acts that the government argues places the items within the scope of a search for materials "in the nature of" child abuse, child erotica, and child exploitation. In several of his computer communications with Dena just before his arrest, Raney stated his intention to take photographs of Dena and him

engaging in sexual intercourse and oral sex. For example, just two days before his arrest, Raney sent Dena an e-mail in which he stated that he was going to bring his camera with him in order to "take some nudes then to [sic]" and "take a pic of you sucking me to [sic] and when I fuck you you'll have a pic to see that." (Tr. 104.) This communication fell on the heels of another in which Raney stated that he would "like to take some of you nude and sucking me." (Tr. 100.) And the day of his arrest, Raney had told Dena he would need to make a stop before their scheduled meeting to pick up some film for his camera. It was in light of these on-line communications as well as the discovery of the camera, empty box of film, condom, and sexual lubricant in his car that the agents conducting the search found the homemade adult pornography depicting Raney engaging in oral sex and sexual intercourse. Under these circumstances, it was not plainly erroneous reasonably to construe this homemade adult photography as evidence "in the nature of" child erotica. The homemade adult pornography de-picted acts directly related to Raney's intent to manufacture child pornography depicting identical acts using Dena as a subject.

Besides paying little heed to the particular circumstances of his case, Raney's argument also ignores the breadth of the language of the consent form he signed. He consented to a search for "materials which are evidence in the nature of" child abuse, child erotica, or child exploitation. The use of the "in the nature of" phrase broadens the scope of the search beyond that necessary for the retrieval of only the specific items listed in the form.

Raney's reliance upon cases such as *Dichiarinte*, *Carey*, and *Turner* is therefore misplaced. For example, had the agents in *Dichiarante* obtained consent to search for evi-dence "in the nature of" narcotics, the search would have been broad enough to include the seizure of drug parapher-nalia, scales, and even drug ledgers; such language also

would have enabled the agents to read the defendant's private papers and seize them if they discovered some link to narcotics. Restated, we agree with the government when it argues that the situation in *Dichiarinte* would be analogous to Raney's case assuming the following additional hypothetical circumstances: (1) the agents had received information from the defendant that he sold illegal narcotics in old prescription bottles; (2) the defendant gave the agents consent to search his residence for "evidence in the nature of illegal narcotics," rather than simply narcotics themselves; and (3) during the search of defendant's home the agents came across prescription bottles containing legally prescribed narcotics. Under these hypothetical circumstances, the consent given would include the seizure of those prescription bottles, even if they were legal for the defendant to possess, because they pertain to the manner in which the defendant distributed the narcotics and would thus be evidence "in the nature of" narcotics.

Likewise, the homemade adult pornography seized here, although legal for Raney to have made and possessed, reasonably could be construed to be evidence "in the nature of" child abuse, child erotica, or child exploitation given the broad nature of the consent given and in light of Raney's communications regarding his intent to manufacture child pornography depicting the same sexual acts with Dena.

Unlike the cases upon which Raney relies, where law enforcement officers seized items wholly unrelated to the stated purpose of the search and the charges under investigation (and thus outside of any objectively reasonable construction of the defendant's consent), the agent's seizure of the homemade adult pornography in this case was related to the issue of Raney's intent to abuse and exploit a minor sexually. Based on the totality of these circumstances, including most prominently Raney's stated intention to manufacture pornography depicting himself engaging in sexual intercourse and oral sex with a minor, we find that

a reasonable person would have construed Raney's consent to search his home for evidence "in the nature of" child erotica broadly enough to justify the seizure of evidence that showed Raney's ability and intent to manufacture pornography depicting himself engaging in those sexual acts. We thus find no plain error in the district court's failure to suppress this evidence.

Further, even if the agents were operating outside the scope of Raney's consent when they seized the photographs, the agents would have properly seized the material under the plain-view doctrine, which allows for seizure of material if (1) a law-enforcement officer is lawfully present, (2) an item not named in the warrant (or, likewise, outside the scope of consent) is in the plain view of the officer, and (3) the incriminating nature of the item is immediately apparent (i.e., the government can show probable cause to believe the item is linked to criminal activity). *See United States v. Bruce*, 109 F.3d 323, 328-29 (7th Cir. 1997).

Here, the agents were properly in Raney's residence executing a consensual search of the complete premises when they discovered the photographs in plain view. The agents had probable cause to believe the adult pornography depicted was linked to criminal activity given its homemade nature, the particular acts depicted, and Raney's stated intention to photograph Dena engaging in those same acts; thus, the plain-view doctrine applies.

That the items themselves were perfectly lawful for Raney to have possessed does not bar the application of the doctrine. *See, e.g.*, *Bruce*, 109 F.3d at 328-29 (upholding the seizure of ammunition under warrant to seize rifles; "Ammunition such as shotgun shells, while not contraband, assumes an incriminating nature in connection with the search for items such as assault rifles."); *see also United States v. Van Dreel*, 155 F.3d 902, 905 (7th Cir. 1998) ("Although guns and ammunition may be lawfully pos-

sessed, in the context of bank robbery and hunting out of season, these items assume an incriminating nature, and the court rightfully allowed the officers to search for them in the instant case."); *United States v. Cooper*, 19 F.3d 1154, 1163 (7th Cir. 1994) (empty ammunition box found in search for drugs); *United States v. Cervantes*, 19 F.3d 1151, 1153 (7th Cir. 1994) (large amount of money found in the defendant's car after a drug transaction); *United States v. Walton*, 814 F.2d 376, 380 (7th Cir. 1987) (money and maps found in a bank robbery case).

In fact, in each of the cases relied upon by Raney, the deciding courts recognized the potential application of the plain-view doctrine. In *Dichiarinte*, we held the plain-view doctrine did not apply because the criminal character of the documents was not apparent during a surface inspection; the documents had to be opened and read. 445 F.2d at 130-31. In *Carey*, the Tenth Circuit held the first image of child pornography, which the agent had stumbled upon in his search for narcotics-related evidence, admissible under the plain-view doctrine. 172 F.3d at 1273 n.4. And in *Turner*, the First Circuit refused to apply the doctrine because the government couldn't satisfy the second element—the defendant's consent did not allow law enforcement to search the computer for documentary or photographic evidence. 169 F.3d at 88.

Finally, even if we were to assume *arguendo* that the seizure of the homemade adult pornography was outside the scope of consent and that the incriminating nature of the items was not so readily apparent as to fall within the plain-view doctrine's reach, Raney would still be unable to satisfy his burden under the plain-error standard because he could not show that the introduction of the evidence at his trial affected substantial rights and seriously undermined the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Ramirez*, 182 F.3d

544, 547 (7th Cir. 1999). We will reverse a conviction under plain-error review only where it is necessary to avoid a miscarriage of justice, *United States v. Young*, 470 U.S. 1, 16 (1985); *United States v. Conley*, 291 F.3d 464, 470 (7th Cir. 2002), and there is "no miscarriage of justice if the defendant's guilt is so clear that he would certainly have been convicted even if the error had never been committed." *United States v. Baker*, 78 F.3d 1241, 1246-47 (7th Cir. 1996) (quotation omitted). Here, the government presented ample evidence aside from the homemade adult pornography upon which the jury would have rendered a guilty verdict, including all the on-line communications between Dena and Raney, in which he described with particularity his intent to photograph Dena engaging in sexual intercourse and oral sex with him, the tape-recorded phone conversations between Officer Montecelo and Raney, and the loaded camera, empty box of film, sexual lubricant, and condom found in Raney's car that afternoon. Thus, Raney cannot establish that this error affected his substantial rights or that it seriously affected the fairness of his proceedings.

We will not belabor the obvious conclusion that Raney's remaining challenges regarding the introduction of this evidence at trial must also fail. Given our observation that the homemade nature of the photos and the particular acts depicted therein were probative of Raney's intent to photograph himself engaging in those same acts with Dena, we don't think his attorney erred in failing to move to suppress them (for, given our analysis, his challenge likely would have failed) nor that the district court erred by admitting them for the limited purpose of showing intent. *Accord United States v. Esch*, 832 F.2d 531, 535-36 (10th Cir. 1987) (finding that "swingers" magazines, as well as advertisements and photographs mailed to such magazines by defendants, were relevant and admissible in child-exploitation case to show that defendant had previously sent

sexually explicit materials through mail and that she knew or had reason to know that the photographs that gave rise to her prosecution would be mailed); *United States v. Garot*, 801 F.2d 1241, 1247 (10th Cir. 1986) (upholding admission of pornography that was arguably legal in child-exploitation case for the limited purpose of showing scienter). But even if Raney's attorney or the district court did err, Raney can't possibly establish that he was prejudiced by the errors given the plethora of other evidence that was probative of his intent including, *inter alia*, the loaded camera, empty film box, condom, sexual lubricant, and his repeated explicit statements regarding his intent to photograph Dena.

We can dispense with Raney's final argument—that he can't be convicted under an indictment that charged him with attempting to manufacture child pornography in violation of § 2251—with similar brevity. Section 2251 reads as follows:

> (a) Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, shall be punished as provided under subsection (e), if [defendant's conduct satisfies the statute's jurisdictional interstate-commerce element] . . . .

> (e) Any individual who violates, *or attempts or conspires to violate*, this section shall be fined under this title and imprisoned not less than 15 years nor more than 30 years. . . .

18 U.S.C. § 2251 (2003) (emphasis added). Under the plain reading of § 2251, it is a violation of the statute to manufacture child pornography, to conspire to manufacture child pornography, or to attempt to manufacture child pornography. *Id.* Raney tries to parse the statute by arguing that the "charging" language of subsection (a) and the "punishment" language of subsection (e) should be treated as sepa-

rate offenses. Because the word "attempt" does not appear in subsection (a), Raney argues that it is not a violation of the statute to attempt to manufacture child pornography. *See United States v. Anderson*, 89 F.3d 1306, 1314 (6th Cir. 1996) ("Attempt is only actionable when a specific federal criminal statute makes it impermissible to attempt to commit the crime."); *United States v. Padilla*, 374 F.2d 782, 787 n.2 (2d Cir. 1967) (same).

Other courts that have had occasion to construe § 2251 have concluded that it plainly proscribes not only the manufacture of child pornography, but also the inchoate crimes of attempt and conspiracy. *See United States v. Crow*, 164 F.3d 229, 234-35 (5th Cir. 1999) (recognizing that "[subsection (e)] provides punishment for 'any individual who violates, or attempts or conspires to violate' this section.") (quoting pre-2003 amendment version of 18 U.S.C. § 2251(d)); *United States v. Buculei*, 262 F.3d 322, 328-30 (4th Cir. 2001) (observing that simply because the defendant was unsuccessful in his attempt to actually produce a visual depiction of sexually explicit conduct with a minor does not mean that he did not violate § 2251). And while neither *Crow* nor *Buculei* is dispositive, similar challenges to nearly identical statutory schemes have failed. *See, e.g.*, 18 U.S.C. § 1751 (2003) (proscribing in subsection (a) the killing of the President of the United States and in subsection (c), amid punishment-related language, anyone from attempting to kill the President); *United States v. Duran*, 96 F.3d 1495, 1507-09 (D.C. Cir. 1996) (upholding charge of an attempt to kill the President under these two subsections). We therefore hold that § 2251 clearly proscribes the attempt to manufacture child pornography and that Raney's indictment charging him with an attempt to violate § 2251(a) & (e) was not defective.

## CONCLUSION

Because we find the homemade adult pornography within the scope of the consent search and probative of Raney's intent to manufacture homemade child pornography, we find no Fourth Amendment violation nor error in allowing the material to be introduced into evidence at trial. But even if we had found error, it would have been harmless given the overwhelming evidence implicating Raney's guilt. And because 18 U.S.C. § 2251 clearly proscribes attempts to manufacture child pornography, Raney's argument that the second count of the indictment was defective is wholly without merit. We, therefore, AFFIRM.

ROVNER, *Circuit Judge*, concurring in the judgment. I do not agree that the evidence was properly seized as evidence "in the nature of" child abuse or as evidence of an incriminating nature under the plain view doctrine. The photographs at issue were lawful photographs of consenting adults and have no relationship to child abuse. In addition, there is no reason to believe that those lawful photographs of adults were "linked to criminal activity." Although the evidence may well have been admissible at trial if properly seized, as relevant to his claim that he had no intent to take explicit photographs, that is not the same question as whether it is "in the nature of" child abuse for purposes of the initial seizure, or as whether it is of "an incriminating nature that is immediately apparent" for the plain view doctrine.

Although I disagree with the majority on those points, I agree that the admission of the evidence does not constitute reversible error. Raney cannot demonstrate the failure to suppress the photographs constitutes plain error because he cannot establish that it affected his substantial rights, or prejudiced him. Raney stated in his e-mails his intention to take pictures of the two of them engaged in various sex acts, and had e-mailed a picture of himself nude. Raney also told "Dena" that he would bring his camera and needed to stop for film, and the police seized the camera loaded with film and an empty Kodak film box from Raney's car at the time of his arrest. The photographs do not add anything to that. At most, the photographs indicate Raney's ability and willingness to take such pictures, but the picture of himself that he e-mailed, the statements in his e-mail, and his actions in bringing the camera and purchasing film for it, establish those same propositions much more directly. Because I agree that there is no plain error here requiring reversal, I concur in the judgment.

A true Copy:

     Teste:

                 _____
                 *Clerk of the United States Court of*
                 *Appeals for the Seventh Circuit*